*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0134p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          *v.*

CRAIG ALEO,
          *Defendant-Appellant (10-1569/1570),*

JOHN FREEMAN,

          *Appellant (10-1833).*

Nos. 10-1569/1570/1833

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 09-20165-001; 09-20458-001; 09-20165;
Bernard A. Friedman, District Judge.

Argued: January 26, 2012

Decided and Filed: May 15, 2012

Before: BOGGS, ROGERS, and SUTTON, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, Matthew W. Heron, Detroit, Michigan for Appellants. Andrew Goetz, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, Matthew W. Heron, Martin E. Crandall, Detroit, Michigan for Appellants. Andrew Goetz, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

          BOGGS, J., delivered the opinion of the court, in which ROGERS and SUTTON, JJ., joined. SUTTON, J. (pp. 23–32), delivered a separate concurring opinion.

————————————

**OPINION**

————————————

BOGGS, Circuit Judge.  In this case, we deal with two appeals arising out of the criminal conviction and sentencing of Craig Aleo.  Craig Aleo appeals his sentence (Part I), and his trial attorney, John Freeman, appeals the sanction imposed upon him by the district court (Part II).

Craig Aleo was sentenced to the statutory maximum sentence of 720 months of imprisonment after he pleaded guilty to one count each of producing, possessing, and transporting and shipping child pornography.  His guidelines range was 235–293 months.  Because we cannot find a justification within the factors enumerated in 18 U.S.C. § 3553(a) to justify the variance imposed by the district court, we reverse and remand for resentencing.

Craig Aleo's trial counsel, John Freeman, was sanctioned $2,000, based on the district court's inherent power to sanction, because he filed a motion asking the court to compel the government to make a formal motion regarding any victim who wanted to speak at trial pursuant to the Crime Victim Rights Act (CVRA), naming the victim, and providing a preview of the victim's statement.  Because there is no objective evidence that trial counsel filed this motion in bad faith, we reverse.

I

On April 14, 2009, Aleo was charged with one count of production of child pornography (Count One), in violation of 18 U.S.C. § 2251(a) and one count of possession of child pornography (Count Two), in violation of 18 U.S.C. § 2252A(a)(5)(B).  This indictment issued from a grand jury in the Eastern District of Michigan.  On April 30, 2009, Craig Aleo was charged with one count of transporting

and shipping child pornography (Count Three), in violation of 18 U.S.C. § 2252A(a)(1). The indictment for this offense issued from the Northern District of New York.[1]

Aleo pleaded guilty to all counts. At sentencing, he was sentenced to the statutory maximum for all three counts—720 months of imprisonment—to be served consecutively. On appeal, Aleo challenges the procedural and substantive reasonableness of his sentence, and requests that his case be remanded for resentencing before a different judge. We reverse his sentence for being substantively unreasonable and remand for resentencing.

A

Aleo, a 66-year-old resident of Davisburg, Michigan, was identified in October 2006, by agents from the Bureau of Immigration and Customs Enforcement (ICE), as one of a group of individuals who owned and controlled a certain Paypal account that was used to make payments to child-pornography websites. While under investigation, Aleo paid $99.95 and $79.95 into the Paypal account for access to two separate child-pornography websites. On May 24, 2008, Aleo joined a child-pornography website, giving his identifying information and credit card number. ICE agents obtained a search warrant and were able to determine that Aleo's email address had been used to access child-pornography images and video on May 26, 2008, May 27, 2008, and June 1 through June 3, 2008.

On March 26, 2009, Aleo and his wife drove into the port of entry at Alexandria Bay, New York, from Canada. Because he was listed on an ICE database as being under investigation for violations relating to child pornography, Aleo was stopped for a secondary inspection. Customs officers inspected Aleo's car and found a laptop, two thumb drives, and numerous memory cards. These were inspected, and officers found 13 images of child exploitation, including at least three of prepubescent girls performing sex acts on men, and one movie file.

---

[1]The Northern District of New York charge was transferred, after Aleo waived personal appearance, for plea and sentence to the Eastern District of Michigan to be consolidated with Count One and Count Two, pursuant to FED. R. CRIM. P. 20.

Aleo was arrested and read his *Miranda* rights. He then asserted ownership of all the electronics and told the agents that he knew the computer contained images of child pornography. He also told the agents that he subscribed to two child pornography websites, Dreamzone.com and HushHush.com. He told the officers that he did not upload or trade images, but only downloaded and stored images on his computer. He told the officers that he had another computer at home, and gave a written statement to that effect. This incident was the basis on which Aleo was charged in New York with production and shipping of child pornography (Count Three).

On March 27, 2009, ICE agents obtained and executed a search warrant at Aleo's residence. Agents seized two computers, CDs, DVDs, and other types of stored electronic media. A search of these conducted by the Utica (Michigan) Police Department showed 1,186 images of child pornography. Of these, 912 of the images or videos showed prepubescent children. Eight still images and one video showed "sadomasochistic" images. Aleo's USB drive contained 125 short videos "that appeared to have been taken with a hidden camera in a bathroom." These all showed the date January 7, 2000. The clips showed adults and children in the bathroom, probably filmed with a motion-sensitive camera. Several images showed a girl, later identified as Aleo's five-year-old granddaughter, putting on a dress, and some were of her and other girls "in various states of dress."

One of Aleo's DVDs also shows a girl later identified as Aleo's five-year-old granddaughter taking a bath. The DVD appears to have been made on November 8, 2006. This video was described by ICE agent Donald Raymo at Aleo's detention hearing, held April 21, 2009, in the United States District Court for the Eastern District of Michigan. According to Raymo, Aleo puts the girl in the bath, she bathes, and then Aleo dries her off and, while drying her, penetrates her vaginal area with his finger. Raymo also offered the following description:

> Q: What specifically can you see when you watch the video?
> A: Certainly a display of the little girl's genitalia.
> Q: It's focused on her genitals?
> A: Definitely.

. . .
A: The little girl is standing up on a cupboard and Mr.—the male figure appears to be drying a child off.
Q: With a towel?
A: With a towel, and in portions there also certainly appears to be some inappropriate contact.  There's some sexual assault.
Q: Specifically what?
A: Digital penetration.
Q: So you see Mr. Aleo's finger or what you believe to be Mr. Aleo's finger—
Mr. Freeman: Your Honor, I'm going to object.  I think we all know what that means.
The Court: Sustained.

R.62 at 65–66.[2]

This video was the basis for the Count One.  It was also the basis for a "Criminal Sexual Conduct 1st Degree" charge against Aleo in Michigan state court,[3] to which Aleo pleaded "no contest."

As a result of his offense, Aleo's mental health was evaluated by a psychotherapist referred by defense counsel.  The psychotherapist described Aleo as meeting the clinical definition of a pedophile.  Aleo's risk-assessment score indicated a low risk to re-offend sexually and a low risk to act out in a violent manner.

B

Aleo pleaded guilty without a plea agreement to all counts against him.

The United States Probation Department prepared a presentence report (PSR) for Aleo.  The PSR calculated a base offense level for Count One of 32.  To this base offense level, four levels were added because the production of child pornography involved a minor under the age of twelve; two levels were added because the offense

---

[2]The video was submitted to the National Center for Missing and Exploited Children to determine if it had been identified in any previous law enforcement investigations or if it or images from it had been distributed or uploaded to the internet. The Center found no information suggesting that the images had been so used.

[3]The statute for "Criminal Sexual Conduct in the First Degree" provides: "(1) A person is guilty . . . if he or she engages in sexual penetration with another person and if any of the following circumstances exists: (a) [t]hat other person is under 13 years of age." MICH. COMP. L. § 750.520b(1).

involved the commission of a sexual act or sexual contact (the PSR described the video of Aleo's granddaughter as showing Aleo "penetrat[ing] [the child] vaginally with his finger"); and two levels were added because Aleo was a relative of the minor in the offense and the minor was in his custody, care, or supervisory control. Therefore, Aleo received an Adjusted Offense Level of 40.

Counts One, Two, and Three were grouped, pursuant to U.S.S.G. § 3D1.2.[4] One level was added pursuant to U.S.S.G. § 3D1.4.[5] Three levels were subtracted for acceptance of responsibility. Aleo's total offense level was thus 38. Aleo had no criminal history points, making his guidelines range 235–293 months.

The government and Aleo made objections to the PSR. The government calculated Aleo's guideline range to be 262–327 months, arguing U.S.S.G. § 3D1.4 required that 2 levels, not 1, be added to the adjusted offense level of 40, because the counts could not be grouped together. Based on this calculation, the government recommended that Aleo be sentenced to 300 months, followed by a life term of supervised release.

Aleo argued that the PSR's calculation was incorrect because the video did not show him digitally penetrating his granddaughter. Aleo reiterated his arguments in a subsequent supplemental sentencing memorandum, in which his trial counsel argued that he had "reviewed the video and [discussed] it with another experienced criminal defense attorney" and that the footage depicted Aleo drying the girl off, with no sexual touching.

Aleo acknowledged that his offenses carried a mandatory minimum sentence of 180 months on Count One and 60 months for the Count Three. He requested that these mandatory minimum sentences be imposed because he was a first-time offender, he had

---

[4]The section states that "closely related counts" should be "grouped together into a single Group." Counts are closely related when, as in this case, "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts."

[5]Section 3D1.4 provides that grouped counts can result in a specified offense-level increase.

positive past contributions to society, and he had health problems.**[6]**  He asked that the sentences be imposed to run concurrently, so that he would serve 180 months of imprisonment.

C

Aleo was sentenced on April 15, 2010.  The judge stated that he had seen the objections to the PSR, that he had received the sentencing memoranda from Aleo and the government and Aleo's supplemental sentencing memorandum.  The judge stated that as to both parties' objections he would adopt the response by the Probation Department.  The judge stated that Aleo would thus be held to have an offense level of 38 with a criminal history level of I.

After the judge's initial statements, Aleo's daughter and son-in-law, the parents of the victim in the DVD, both made statements.

The government then made a statement reiterating its recommendation of 300 months of imprisonment followed by a lifetime of supervised release.  Aleo's attorney then spoke, stating his belief that "there is a legitimate factual dispute concerning the factual accuracy that there was sexual touching and penetration."   He reiterated his request that the judge sentence Aleo to the mandatory minimum of 180 months of imprisonment.

---

**[6]**Aleo had a history of heart disease, kidney failure, and complications from diabetes.  He had a quadruple heart bypass surgery in 2000, and required a kidney transplant in 2001.  Aleo has also had problems with foot gangrene as a result of diabetes.  In 2010, his fifth left toe was amputated; the next month a toe on his right foot was amputated.

During his allocution, Aleo stated the following:

>  Your Honor, I want to apologize to my family for all the pain which I caused them because of my actions and sins. I ask for their forgiveness.
>  I apologize to my wife for forgiving me and who has supported me this past year with letters everyday and a visit every week.
>  Your Honor, over 30 years ago, we made a promise to each other that we would work hard and live together, that we would enjoy our love for each other forever like we were newly weds. I broke that promise, your Honor. But I made her a new promise. Through prayer and therapy we will together conquer my affliction and I will walk out of a prison, God willing, and we will live out our lives in retirement together.
>  Lastly, but certainly not the least, I apologize to the Court for the countless hours spent because of my actions. I ask the Court to have mercy on me in sentencing so I might have a chance for freedom and to fulfill my promise.

The sentencing judge then assessed Aleo's sentence and his reasons for choosing the punishment. In relevant part, he stated:

>  . . . Number one, I think this is perhaps one of the most despicable cases that I have ever been involved in, in 28 years on the bench. I've been thinking about it, thinking about it and I can't think of another case.
>  . . . I've listened to the defendant's attorney argue today and I've listened to the defendant. I've heard not a word of remorse. Not a word. Everything was about the defendant, his poor health, his age, he lost some toes, and he's talking about the love for his wife. But not a—nothing of remorse. He doesn't talk about the victims here, that the victims are going to be emotionally scarred for the rest of their lives. The fact that images are out there, that he took them. That it was a relationship of a granddaughter, his granddaughter, his own flesh and blood. Not one thing. . . . No remorse whatsoever.
>  The Court . . . believes that the sentencing guidelines are totally nonapplicable to this case. There is no human committee, and that's what the sentencing guideline commission is, it's a human committee that tries to equalize a fairness in terms of sentencing. I don't think they ever anticipated that a granddaughter would be involved in this kind of—a victim, in this kind of activity and certainly not a grandfather doing it. There's no way they would have been able to even foresee that. So the guidelines . . . certainly is not a guideline for this kind of case . . . .
>  Even excluding . . . the sexual touching and all that, even if [that] didn't exist, again there's no way that the sentencing guidelines are

adequate . . . to punish the defendant for what he has done to the victims and to make this thing right. . . .

The Court believes that the factors in 3553 should be considered. Number one, punishment, and the Court believes the harshest punishment to this kind of action should be imposed on the defendant.

In terms of rehabilitation, I don't know . . . if it's even possible. I have listened to the whole thing and there is no remorse and rehabilitation is very difficult, but there may or may not be.

In terms of deterrence, absolutely. It's very, very important to give the harshest sentence possible to deter others . . . .

. . .

It will be the sentence of the Court that the defendant be committed to the Bureau of Prisons. As to Count One for 30 years, 360 months. As to Count Two, 120 months, 12 years, that he is to serve consecutively to each other.

As to [Count Three], it is the sentence of the Court that the defendant be sentenced to 240 months, or 20 years which is the maximum. Again, to be consecutive to the other sentences . . . .

. . .

That should he be released from prison and I hope he isn't that he will be placed on a period of supervised release for five years . . . .

The judge stated further, "The discretion of the sentencing is up to me. I believe [Aleo] has no remorse, but even if he had remorse, I would not change that sentence because of the despicable act that he did."

Aleo filed this timely appeal.

D

Aleo challenges the procedural and substantive reasonableness of his sentence. Aleo asks that his case be remanded for resentencing to a different judge, because he believes Judge Friedman would have difficulty putting out of his mind his previously expressed views of the case.

*Procedural Reasonableness*

Aleo's first argument is that his sentence was procedurally unreasonable. Specifically, he argues that the district court failed to rule on the factual dispute as to whether or not the video depicted Aleo sexually touching his granddaughter, and this

failure violated Federal Rule of Criminal Procedure 32(i)(3)(B).  He also argues that the district court failed to calculate the guidelines range.

We review a district court's sentence under an abuse-of-discretion standard. *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009).  A sentence is procedurally unreasonable if the district court "fails to calculate (or improperly calculates) the Guidelines range, treats the Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the chosen sentence." *Ibid.*

Federal Rule of Criminal Procedure 32(i)(3)(B) provides that, "[a]t sentencing, the court must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."  The Sixth Circuit requires "literal compliance" with Rule 32.  *United States v. Tackett*, 113 F.3d 603, 613 (6th Cir. 1997), *cert. denied*, 522 U.S. 1089 (1998).  Aleo also argues that the district court's failure to rule on whether or not he sexually touched his granddaughter deprived him of the right to have sentencing enhancements proven by the government by a preponderance of the evidence.

The government is required to establish the existence of a factor supporting a sentencing enhancement by a preponderance of the evidence.  *United States v. Gibson*, 985 F.2d 860, 866 (6th Cir.), *cert. denied*, 508 U.S. 979 (1993).  If a "contested sentencing enhancement factor appears in the probation report and is not proved by the government at the hearing,  the court must insure that the factor is otherwise proved by reliable evidence before using it to increase the sentence." *United States v. McMeen*, 49 F.3d 225, 226 (6th Cir. 1995).

The district court did rule on Aleo's objection regarding whether sexual touching took place.  The district court stated that Aleo's no-contest plea in state court constituted an admission of the offense charged, which was the same as the contested enhancement.  Therefore, the court ruled that the fact of Aleo's sexual touching of his granddaughter had been established, satisfying Rule 32.

Further, sexual contact was proved by a preponderance of the evidence.  Officer Raymo's testimony about the video and Aleo's no-contest plea to the charge of "Criminal Sexual Conduct in the First Degree" in state court suffices to prove the fact by a preponderance of the evidence.  *See United States v. Vanbuhler*, 558 F. Supp. 2d 760, 765–67 (E.D. Mich. 2008) (imposing a sentencing enhancement based on defendant's no-contest plea to a Michigan offense).  By pleading no contest to Criminal Sexual Conduct in the First Degree, Aleo admitted every essential element of the offense. *United States v. Freed*, 688 F.2d 24, 25–26 (6th Cir. 1982).   Therefore, Aleo admitted that he "engage[d] in sexual penetration" of the victim. *See* MICH. COMP. L. § 750.520b.

Aleo next argues that his sentence was procedurally unreasonable because the sentencing judge failed to calculate the guideline range.  *Baker*, 559 F.3d at 448. Specifically, he argues that the judge did not re-calculate the range after Aleo raised his objection to the sentencing enhancement regarding sexual contact.  Because the district court resolved the dispute regarding sexual contact, and because the enhancement for sexual contact was properly proved by a preponderance of the evidence, the district court did properly calculate the guidelines range as 38, with criminal history category I. Aleo's argument that the court failed to calculate the guidelines range is meritless.

Therefore, Aleo's sentence was procedurally reasonable.

*Substantive Reasonableness*

Aleo next argues that his 720-month sentence was substantively unreasonable. In deciding on a sentence, the sentencing judge must impose "a sentence sufficient, but not greater than necessary, to comply with" the basic aims of sentencing as set forth in 18 U.S.C. § 3553(a).[7]  In deciding on a defendant's sentence, the judge should begin by

---

[7]The factors to be taken into account in sentencing are:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care,

considering the Sentencing Guidelines range prescribed for the defendant's offense. *Gall v. United States*, 552 U.S. 38, 49 (2007). The judge should then allow the state and the defendant argue for the sentence they believe should be imposed. The judge should then consider all of the § 3553(a) factors. If the judge "decides that an outside-Guidelines sentence is warranted, [the judge] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50; *see also United States v. Davis*, 537 F.3d 611, 614 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008). The "farther the judge's sentence departs from the guidelines sentence . . . the more compelling the justification based on factors in section 3553(a) must be." *United States v. Poynter*, 495 F.3d 349, 352 (6th Cir. 2007) (internal quotation marks omitted). After choosing a sentence, the judge must adequately explain it to allow "meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50.

We review the sentence imposed for an abuse of discretion. *Id.* at 51. When a sentence is outside the guidelines range, the appellate court "may not apply a presumption of unreasonableness." *Ibid*. Instead, the reviewing court must give "due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Ibid*. We must respect the fact that the sentencing court observed the defendant and the witnesses firsthand, and that the sentencing court has a wide variety of sentencing cases to compare each case to, unlike an appellate court. Our role is not to usurp the sentencing judge's position as the best interpreter of the facts. However, we must ensure that when there is a variance, the greater the variance from the

---

or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—
   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission and in effect on the date defendant is sentenced]; . . .
(5) any pertinent policy statement [issued by the Sentencing Commission and in effect on the date defendant is sentenced];
(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

range set by the Sentencing Guidelines, the "more compelling the justification based on the factors in § 3553(a)" was. *See Poynter*, 495 F.3d at 352; 18 U.S.C. § 3553(a)(6).

The district judge sentenced Aleo to 720 months of imprisonment, which is almost two and one-half times longer than 293 months, the top of Aleo's guidelines range. As it exceeds the guidelines range, the sentence is not entitled to a presumption of reasonableness. *Gall*, 552 U.S. at 51. Further, because the sentence goes so far beyond the guidelines range, we must determine if the district court provided compelling reasons for such a variance. We must also determine whether sentencing Aleo at the statutory maximum will create sentencing disparities between Aleo and similar offenders. *See* 18 U.S.C. § 3553(a)(6).

The district judge provided several reasons for the sentencing variance imposed. The judge stated that he believed the guidelines could not possibly have envisioned a crime as horrendous as Aleo's. He stated the strongest possible deterrence was needed for this type of crime. He also stated repeatedly that Aleo was remorseless. Importantly, though, the judge also stated that he would have imposed the same sentence even if he had thought Aleo had been remorseful, based entirely on the "despicable act that he did." Therefore, the judge primarily based his variance from the guidelines on the actual act of Aleo possessing child pornography, transporting child pornography, and filming his five-year-old granddaughter in the bath and sexually touching her while drying her off. We must determine whether compelling reasons justified imposing the maximum statutory penalty on this act.

First, we question the district judge's belief that the sentencing guidelines could not have envisioned a crime such as Aleo's. In fact, the Sentencing Guidelines do envision a crime such as Aleo's—Aleo's guidelines calculation included several enhancements that specifically addressed the unique characteristics of his offense. Four levels were added because Aleo produced child pornography with a minor under the age of twelve. Two levels were added because the offense involved the commission of a sexual act or sexual contact. Two levels were added because Aleo was a relative of the minor and the minor was in his custody, care, or supervisory control. Therefore, the

guidelines expressly take into account a defendant who creates child pornography using a relative, when the relative was under the age of twelve, under the individual's supervision, and who the defendant sexually touched during the creation of the pornography. The guidelines do not specifically differentiate the grandparent/grandchild relationship from other familial relationships, but neither do they differentiate the parent/child relationship, which, when involved in an offense, seems equally or more deserving of condemnation. The guidelines took into account the very factors that the sentencing judge said that they did not. Therefore, the belief that these factors were not envisioned by the creators of the guidelines is not a compelling justification for the judge's variance from the guidelines range.

The district court justified its variance from the guidelines by stating that "the strongest possible deterrence" was needed for Aleo's offense. However, " not all . . . sex offenders deserve what amounts to a life sentence; otherwise, Congress would not have set a statutory range of 0–60 years." *Poynter*, 495 F.3d at 354. The 720-month sentence threatens to cause disparities in sentencing, because it provides a top-of-the-range sentence for what is not a top-of-the-range offense.

The district court imposed a harsher sentence on Aleo than has been imposed on defendants who committed similar crimes. In a recent case, a grandfather who possessed 64 images of his minor granddaughter in sexually explicit positions, as well as 908 other downloaded child-pornography images and files, received a top-of-the-guidelines sentence of 151 months of imprisonment. *United States v. Hunley*, 290 F. App'x 884, 885–86 (6th Cir. 2008). In another case, a grandfather persuaded his three-year-old granddaughter to perform oral sex on him by showing her images of children performing oral sex. *United States v. Gawthrop*, 310 F.3d 405, 408 (6th Cir. 2002). He received 70 months of imprisonment, representing the midpoint of his guideline range of 63–78 months, and well under his statutory maximum sentence of 20 years. *See id.* at 406. Under *Poynter*, Aleo's sentence should avoid unwarranted disparity with sentences received for similar crimes. It is unwarranted for Aleo to receive a sentence ten times greater than the sentence in *Gawthrop*, in which the defendant also had a Criminal

History category of II, as opposed to Aleo's category of I, or nearly five times greater than the defendant in *Hunley*. There is no compelling justification for differentiating his offense so dramatically from theirs.

Not only did the district court err in its consideration of disparity because similar offenders have received significantly lighter sentences, it also failed to note that defendants who received sentences of the statutory maximum committed significantly worse crimes. For example, in a case in which the defendant was sentenced to 65 years, the defendant made a pornographic videotape of himself committing sexual acts on his girlfriend's eight-year-old daughter on three separate occasions, two while she was drugged and asleep and one where she was awake and acted out his commands. *United States v. Vowell*, 516 F.3d 503, 508 (6th Cir. 2008). The offense conduct included oral-to-genital contact, and attempted anal and genital penetration. *Id*. at 507. He also planned to sell the tape on the internet. *Ibid*. In order to avoid being apprehended, the defendant also stole a car and fled authorities. In sentencing him, the district court varied from a guideline range of 188–235 months to impose a sentence of 65 years followed by a lifetime of supervised release, where the statutory maximum sentence was 70 years. *Id.* at 511.[8]

This circuit has reversed sentences as substantively unreasonable where the district court failed to offer a compelling justification for a sentence that varied dramatically from the guidelines range. In a recent case, we reversed as substantively unreasonable a 720-month sentence imposed on a repeat child sex offender. *Poynter*, 495 F.3d at 358. Poynter sexually abused and drugged several boys over a period of years. *Id.* at 350. He pleaded guilty to four counts of illicit sexual conduct with minors.

---

[8]Cases from outside our circuit also serve to demonstrate the type of offenses that should be given the harshest punishment the law can offer. In one, for example, a defendant persuaded his 13-year-old stepdaughter to engage in a host of sexual activities on camera with an adult male, including oral and vaginal intercourse. He was sentenced to a within-guidelines sentence of 1,200 months (his four counts were not grouped because they occurred on four separate occasions and involved "multiple, separate instances of fear and risk of harm"). *United States v. Sarras*, 575 F.3d 1191, 1207–10 (11th Cir. 2009). In another case, where a defendant was sentenced to the statutory maximum for all counts, with the sentences to run consecutively, for a total of 140 years of imprisonment, the defendant had taken at least 150 images and made at least 24 pornographic videos of three boys over the course of years (he made tapes of one boy from the time the boy was 8 until he was 15), drugging the boys to facilitate the offenses. The defendant transmitted these files on the internet. *United States v. Johnson*, 451 F.3d 1239, 1241–42 (11th Cir.), *cert. denied*, 549 U.S. 987 (2006).

His guideline range was calculated to be between 188–235 months. *Ibid*. The district judge justified imposing 720 months, the statutory maximum sentence, because Poynter victimized multiple children, used alcohol or drugs to seduce them, and he was a recidivist. *Ibid*. The Sixth Circuit, however, reasoned that the district court's "primary ground" for the upward variance was that the court wanted to prevent Poynter from offending again. *Id.* at 353. Because the guidelines specifically dealt with "Repeat and Dangerous Sex Offender[s] Against Minors," and provided enhancements for this category of offender, the court held that the variance was not justified. *Ibid*. The court discussed offenders who might be more deserving of the statutory maximum: those who, for example, fled the authorities, did not accept responsibility, or who have been previously convicted of sex offenses with children.

Even more starkly than in *Poynter*, the district court in Aleo's case did not reasonably distinguish Aleo from other sex offenders who molested young relatives. The court did not take into account why Aleo should receive the harshest possible sentence, even though he had not committed the worst possible variation of the crime. He had, for example, cooperated with authorities, admitted responsibility for his actions, and only committed one known offense involving sexual contact with a minor. There was no evidence that he drugged the child or committed more than brief sexual contact. While we share the district court's outrage at Aleo's acts, the justifications offered by the district court do not support the enormous variance beyond the guidelines range and the disparity with sentences of other, similar offenders. The sentence was substantively unreasonable. Therefore, we reverse and remand for resentencing.[9]

---

[9]Aleo argues that a resentencing should be remanded to a different judge. A decision to remand to a different judge is based on considerations of whether the judge on remand is capable of providing a fair and unbiased rehearing of the case, as well as with considerations of efficiency and the preservation of judicial resources. *See, e.g.*, *United States v. Faulks*, 201 F.3d 208, 209 (3d Cir. 2000); *United States v. Garcia-Robles*, 640 F.3d 159, 168 (6th Cir. 2011) (considering whether there is "evidence in the record indicating that the district judge will have difficulty conducting de novo sentencing" proceedings.). We trust that Judge Friedman will revisit the matter with a completely open mind at the de novo resentencing that must now take place, *Faulks*, 201 F.3d at 209, and we thus do not accept Aleo's argument.

II

Part II of this opinion deals with the $2,000 sanction imposed on Aleo's trial counsel, John Freeman. Freeman was sanctioned when the district court decided that he filed a meritless motion in a bad-faith effort to intimidate a victim who wished to speak during Aleo's sentencing hearing, pursuant to her rights under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771. The court abused its discretion in deciding that Freeman's motion was filed in bad faith. Therefore, we reverse the sanctions.

A

On March 23, 2010, when he received the PSR, Freeman learned that victims of Aleo's offense—namely Aleo's daughter and son-in-law, the parents of the abused granddaughter—planned to speak at the sentencing hearing. Freeman states that he became concerned about what the victims might say after discussing the issue with Aleo on April 5. On April 6, Freeman expressed concerns about the victim statements in an email to the Assistant United States Attorney (AUSA) who was prosecuting the case. He wrote:

> Paragraph 28 refers to the defendant's daughter and her request to speak at sentencing. Please let me know whether you intend to seek permission from the court for her to speak. Also, please provide me with an offer of proof regarding what you expect her to say.

The AUSA replied, stating that the CVRA did not require him to request permission from the court for a victim to speak, and that he did not have to tell Freeman what the victim would say.

On April 13, 2010, Freeman filed a motion to compel. The motion requested that the court order the prosecutor to file "a formal motion, with notice to defense counsel, seeking permission for the child complainant's mother to speak at sentencing."[10]

---

[10]The Crime Victim's Rights Act provides:
(a) Rights of crime victims.–A crime victim has the following rights:
. . .
(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
. . .

Freeman described his fruitless email correspondence with the AUSA.  Freeman said that because the prosecutor had refused to do as he asked that he had no choice but to ask the court to compel the prosecutor under the "motion and notice requirement of the CVRA."

At Aleo's sentencing, Freeman reiterated the request embodied in his motion. The district judge indicated that he did not want to discuss the motion, that he was going to deny the motion, and that he would be issuing a written order.

On May 3, 2010, after it had issued its judgment regarding Aleo, the court issued an order denying Aleo's motion to compel and ordered additional briefing from the parties on the question of sanctioning Freeman.   The order described the motion as unwarranted and baseless.  It stated that "Freeman's motion serves solely as a blatant attempt to intimidate the minor victim's mother," and that "Freeman should know that his client does not have a right to respond to a statement pursuant to the CVRA, and Freeman's intention to do so makes a mockery of the CVRA."  The court did note that § 3771(d)(3)—a subsection of the CVRA cited by Freeman—directs the court to "take up and decide any motion" filed, but stated that this language "certainly does not compel the victim to file a motion."  The court requested that Freeman and the government submit briefing on the issue of appropriate sanctions.

In his brief on appropriate sanctions, Freeman stated that the motion had been filed in good faith to address "a potential conflict between a defendant's due process

---

(b) Rights afforded–
(1) In general.–In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a).  . . .
. . .
(d) Enforcement and limitations.—
(1) Rights.–The crime victim or the crime victim's lawful representative, and the attorney for the Government may assert the rights described in subsection (a).  A person accused of the crime may not obtain any form of relief under this chapter.
. . .
(3) Motion for relief and writ of mandamus.–The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred.  The district court shall take up and decide <u>any motion</u> asserting a victim's right forthwith.  If the district court denies the relief sought, <u>the movant</u> may petition the court of appeals for a writ of mandamus.  . . .

18 U.S.C. § 3771 (emphasis added).

rights and a victim's right to be heard . . . under the [CVRA]." He noted that § 3771(d)(3) mentioned the court deciding motions, which led him to believe that motions were required, and cited an article by Amy Baron-Evans, regarding "Rights and Procedures Under the Crime Victims' Rights Act" that had given him this idea.[11] He argued that defendants have a due-process right at sentencing to have notice and be heard regarding disputed facts, citing *United States v. Hayes*, 171 F.3d 389, 392 (6th Cir. 1999) and *United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992) (en banc), *cert. denied*, 507 U.S. 990 (1993). He stated that he recognized that judges could consider evidence at sentencing that would be inadmissible at trial, but that any evidence must nevertheless have sufficient indicia of reliability to support its probable accuracy. Therefore, Freeman argued, as a "zealous advocate," he had wanted to determine what facts might be brought out at sentencing by the child's mother, in case she brought up disputed or unreliable facts.

The government's response to the court's request for briefing recommended that Freeman not be sanctioned. The government assumed that the court would, if it decided to sanction Freeman, do so under Federal Rule of Criminal Procedure 42, which states the elements of criminal contempt as: (1) that the defendant engaged in misbehavior, (2) that the misbehavior obstructed the administration of justice, (3) that the misbehavior occurred in the presence of the court, and (4) that the defendant acted with the intent to obstruct. *Vaughn v. City of Flint*, 752 F.2d 1160, 1167 (6th Cir. 1985). The government stated Freeman's erroneous reading of the CVRA did not obstruct justice, because the government never told the victims about the motion and generally ignored it.

Nevertheless, the district court issued an order imposing sanctions of $2,000 on Freeman. The court stated that "defendant's brief affirms the Court's initial impression"

---

[11] Indeed, this article does state that the CVRA requires "[a] victim or alleged victim [to] 'assert' any 'right' by 'motion.'" Amy Baron-Evans, *Rights and Procedures Under the Crime Victims' Rights Act and New Federal Rules of Criminal Procedure*, April 30, 2009, at 58, *available at* http://www.fd.org/docs/select-topics---rules/rules-article-final.pdf?sfvrsn=2. The article also states that "the defendant must be given notice and a full and fair opportunity to respond to any motion asserting a victim's rights. This is necessary to effectuate the defendant's right to due process." *Ibid*. Baron-Evans is a resource counsel who has served as the National Sentencing Resource Counsel in the Office of Federal Public Defenders for Massachusetts, New Hampshire, and Rhode Island. She was ranked as a Massachusetts Super Lawyer in 2004, 2005, 2006, and 2008.

that Freeman filed the motion to intimidate the victim's mother. The court stated that Freeman had been aware that the victim's mother intended to speak since the PSR was issued on March 9, 2010. If he had been acting in good faith, the court argued, he would have filed the motion to compel earlier than April 13, 2010,[12] and ideally would have attached the request for motion and notice as an objection to the PSR. The district court sanctioned Freeman not under Rule 42, as the government had envisioned, but under its inherent authority to sanction "bad-faith conduct in litigation." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 (1991).

On June 21, 2010, Freeman filed a motion for reconsideration of the court's order sanctioning him, addressing the court's inherent power to sanction. He argued that he did not have an improper purpose in filing the motion, and quoted the Baron-Evans article on which he had relied.

The district court denied the motion.

Freeman filed this timely appeal.

B

On appeal, Freeman argues that the district court abused its discretion because it sanctioned him despite the fact that his motion to compel was filed in good faith and not for an improper purpose.

We review a judge's decision to impose sanctions under his inherent authority for an abuse of discretion. *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011).[13] A court may exercise its inherent power to sanction when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," or when the conduct was "tantamount to bad faith." *Ibid.* (citing *Chambers*, 501 U.S. at 45–46; *Roadway Express, Inc. v.*

---

[12]Aleo's sentencing hearing was held on April 15, 2010.

[13]It may be questionable whether the inherent authority to sanction even exists in a criminal case such as this one. An argument can be made that Federal Rule of Criminal Procedure 42, covering criminal contempt, is the sole mechanism for punishing bad-faith conduct in criminal cases. We do not need to reach this issue because Freeman's conduct fails to merit sanctions under either the court's inherent authority or Rule 42.

*Piper*, 447 U.S. 752, 767 (1980)).  The three-part test to determine whether such bad faith was present is whether the district court found "(1) that the claims advanced were meritless, (2) that counsel knew or should have known this, and (3) that the motive for filing suit was for an improper purpose such as harassment."  *Ibid.* (citing *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997)).

Even if Freeman's motion was meritless, and even if Freeman should have known this, the court has not given any evidence to support its position that Freeman filed the motion to harass the victim's mother.  We may uphold an order of sanctions even without an "express finding of willfulness, bad faith or recklessness," but only if the record sets forth evidence that the party acted in bad faith.  *Metz*, 655 F.3d at 490.  The court "must find *something more* than that a party knowingly pursued a meritless claim or action at any stage of the proceedings."  *Id.* at 489 (internal quotation marks omitted).

The only tangible evidence the district court pointed to regarding bad faith was the allegedly belated timing of Freeman's motion.  However, Freeman indeed raised the matter about ten days before the hearing, in the email correspondence with the AUSA.  Only when the matter could not be resolved by agreement did he file.  The subsequent filing of the motion does not establish that he was acting in bad faith.  In fact, Freeman's responses to the court provide tangible evidence, in the form of the Baron-Evans article and § 3771(d)(3) of the CVRA, that he was relying on a colorable litigation strategy and was *not* acting in bad faith.  Finally, nothing in the tone or wording of his original motion indicates an intention to harass the victims.  It was not sent to them, and, even if granted, the court would have compelled the government directly, not the victims themselves.  The record demonstrates only that Freeman's motion was in error, not that he filed it in bad faith.  Without evidence of Freeman's bad faith, the district court abused its discretion.

III

Based on the foregoing reasons, we REVERSE Aleo's sentence and REMAND for resentencing; we REVERSE the sanctions imposed on Aleo's trial counsel, John Freeman.

———————

**CONCURRENCE**

———————

SUTTON, Circuit Judge, concurring. I join the court's decision in full, including its conclusion that the district court abused its discretion when it invoked its inherent power to impose sanctions on defense attorney John Freeman for filing a frivolous motion. I write separately to express skepticism about a lower federal court's power *ever* to use inherent authority, as opposed to the contempt power established by statute (18 U.S.C. § 401) and implemented by rule (Fed. R. Crim. P. 42), to punish a defense attorney in a criminal case for filing a frivolous motion.

Before moving forward with this point, let me take a few steps back. From the founding to the present, the federal courts have possessed "implied powers" that "are necessary to the exercise of all others." *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812); *accord Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). That inherent power extends to civil and criminal cases. *See Chambers*, 501 U.S. at 44; *Illinois v. Allen*, 397 U.S. 337, 342–43 (1970). And that power would seem to include authority to sanction attorneys in criminal cases. When the Constitution established a Supreme Court and Congress later created the lower federal courts, those actions came with an implied delegation to allow the courts to formulate procedures for their cases, including a mechanism to control the lawyers before them. One cannot create a court without giving judges the power to control the courtroom. The First Congress recognized as much, creating a contempt power for civil and criminal cases that exists to this day. *See* Judiciary Act of 1789, ch. 20, § 17, 1 Stat. 73, 83; 18 U.S.C. § 401. In 1944, Rule 42 of the Federal Rules of Criminal Procedure was adopted to lay out a process for exercising the criminal-contempt power.

What intrigues me is not whether the lower federal courts, in the absence of this statute and rule, nonetheless would have power to sanction misbehaving criminal defense lawyers. They assuredly had that power from the outset as a necessary incident

of creation, whether Congress had codified the common law contempt power in 1789 or not.  My question is what remains of that inherent power today.

Congress's Article III power to create the "inferior" federal courts includes the lesser power to limit their authority.  Because the lower federal courts "were created by acts of Congress," the legislature may "limit[]" their "inherent power . . . by statute and rule."  *Chambers*, 501 U.S. at 47; *accord Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 511 (1873).  That explains why the lower federal courts may not use their inherent power to "circumvent[ ]" or "thwart[ ] the purposes of the other sanctioning mechanisms" Congress has provided directly by statute or less directly through the Rules Enabling Act.  *Chambers*, 501 U.S. at 51.

Had this been a civil case, it would have been an easy case.  A court's use of inherent power to sanction the filing of Mr. Freeman's (allegedly) frivolous motion could not be reconciled with the sanctioning regime already in place under the Federal Rules of Civil Procedure.  In a civil case, a district court faced with sharp-elbowed litigation tactics may, indeed must, sanction attorney misconduct under Civil Rule 11, which requires attorneys to certify that any "pleading, written motion, or other paper" is

> (1) "not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation";
> (2) "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law";
> (3) based on "fact contentions [that] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"; and
> (4) "warranted" based on a "reasonabl[e]" belief (or a "lack of information") if the lawyer or party is "deny[ing] . . . factual contentions."

Fed. R. Civ. P. 11(b).  The Rule spells out the procedural prerequisites for imposing a sanction ("notice and a reasonable opportunity to respond"), who may seek sanctions (opposing parties and the court), the types of sanctions available (monetary and nonmonetary) and the purpose and limits of a sanction ("limited to what suffices to deter

repetition of the conduct or comparable conduct by others similarly situated"). Fed. R. Civ. P. 11(c). Other rules, statutes and regulations grant courts *permissive* sanctioning authority to address related problems in civil cases. *See* Fed. R. Civ. P. 16(f), 26(g)(3), 37, 56(h); 18 U.S.C. § 401; 28 U.S.C. § 1927; *see also* 8 U.S.C. § 1229a(b)(6) (immigration proceedings); 37 C.F.R. § 2.120(g) (trademark proceedings); Fed. R. App. P. 38 (appellate proceedings); Fed. R. Bankr. P. 9011 (bankruptcy proceedings).

In the face of these carefully delineated regulations, it would be one thing to invoke inherent sanctioning authority to fill a gap in the Civil Rules, such as conduct outside the court's jurisdiction. *See Chambers*, 501 U.S. at 36–37, 50–51 (litigant and his attorney "attempt[ed] to perpetrate a fraud on the court" by undertaking a series of bad-faith transactions to thwart the judicial process before filing lawsuit). It would be quite another to invoke that power to ease the burden of satisfying existing Civil Rules—to punish practices exempted by a Rule or that fall short of meeting a Rule's standard for sanctionable conduct. *See United States v. One 1987 BMW 325*, 985 F.2d 655, 661 (1st Cir. 1993); *cf. Carver v. Bunch*, 946 F.2d 451, 453 (6th Cir. 1991) (local court rules "cannot conflict with the Federal Rules of Civil Procedure, Acts of Congress, and rules of practice and procedure prescribed by the Supreme Court"). Accordingly, had this been a civil case, a district court could not have used its gap-filling inherent power to sanction Mr. Freeman. Any effort to sanction the lawyer would have to rise or fall based on the relevant rules and statutes already in place.

But this was not a civil case. In contrast to the many rules and statutes empowering the courts to impose sanctions in civil cases, the number of rules and statutes directed solely to attorney misconduct in a criminal case is: none. Even the contempt power authorized by § 401 and Criminal Rule 42 applies to misconduct in criminal *and* civil cases. *See, e.g.*, *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 789–90 (1987); *United States v. Moncier*, 571 F.3d 593, 594, 598 (6th Cir. 2009). All we have is a void, not a gap, when it comes to the statutes and rules directed solely to attorney misconduct in criminal cases, leaving just one other power available—the contempt power—which applies to all federal cases.

What should courts infer from this categorical silence, from the absence of other statutes and rules applicable to sanctions in criminal cases? Does it mean that the contempt power is the only tool available to district courts to deal with attorney misconduct in criminal cases? Or does it mean that Congress and the Rules drafters assumed courts *also* could sanction attorneys in criminal cases based on inherent authority, whether used in ways that mirror the civil rules, ways that mirror inherent powers innovated in civil cases, *see Chambers*, 501 U.S. at 50–51, or still other ways?

I lean toward the former view. There are good reasons to think Congress and the Rules drafters meant to treat civil cases and criminal cases differently when it comes to regulating attorney misconduct. To ensure that criminal defendants receive zealous advocacy, courts "generally tolerate arguments on behalf of criminal defendants that would likely be met with sanctions if advanced in a civil proceeding." *In re Becraft*, 885 F.2d 547, 550 (9th Cir. 1989). Surely the decision not to import Civil Rule 11 into the Criminal Rules, to take one example, was an intentional and sensible one. Otherwise, the risk of sanctions could chill legitimate, indeed constitutionally required, advocacy, and district courts could sanction litigation stances that are utterly appropriate in criminal cases. A frivolous plea of not guilty is one example of the latter. *United States v. White*, 980 F.2d 836, 843 (2d Cir. 1992). A frivolous refusal to admit elements of a charged offense is another. *See* ABA Model Rule of Professional Conduct 3.1 (prohibiting lawyers from making frivolous arguments but permitting criminal-defense attorneys to "defend the proceeding [so] as to require that every element of the case be established"). What, moreover, if a prosecutor "sign[ed] an unjustified indictment," keeping in mind the "doctrine of prosecutorial immunity"? *White*, 980 F.2d at 843. What if a court imposed monetary sanctions against the government, implicating its sovereign immunity and potentially amounting to a sanction greater than Congress allows for bad-faith prosecutions? *See* 18 U.S.C. § 3006A, Statutory Notes (allowing the assessment of costs against the government in a criminal case where "the position of the United States was vexatious, frivolous, or in bad faith"); *United States v. Horn*, 29 F.3d 754, 763–64 (1st Cir. 1994).

Perhaps the Rules drafters could tailor a Civil-Rule-11-like sanctioning regime to the criminal setting. But they conspicuously and, one suspects, consciously have not done so. Neither has Congress done so by statute. Nor has the President done so by executive order. *See* Exec. Order No. 12,778, 56 Fed. Reg. 55,195, 55,197, 55,200 (Oct. 23, 1991) (directing federal government attorneys to "seek sanctions against opposing counsel and opposing parties where appropriate" but exempting criminal cases). Sometimes flagrant inaction amounts to action, particularly where the nearly silent Criminal Rules stand side by side with the many Civil Rules authorizing sanctions. Not only would it be difficult to import many of the civil-sanctioning powers into the Criminal Rules, but the passage of more than three-quarters of a century since the Rules Enabling Act became law without the passage of any comparable rules suggests that the omission is no accident.

Perhaps the omission reflects something else—the difficulty of drafting sanctions rules for criminal cases and the resulting utility of allowing district courts to use an inherent-sanction power on a case-by-case basis. I do not doubt the former, but I cannot believe the latter is the answer. The reason drafting such rules presents a challenge is that the stakes of a criminal trial are so high. A fair trial is the objective in civil cases, but it is the overriding constitutional imperative in criminal cases. The notion that district courts have a free-floating inherent power to sanction frivolous legal positions taken by attorneys in criminal cases but not civil cases flips these priorities.

That leaves the best inference: Congress and the Rules makers meant to give the federal courts just one tool—the contempt power—to discipline attorneys in criminal cases. Here is how the statute and Rule lay out the power and the process. The statute says in full:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>> (2) Misbehavior of any of its officers in their official transactions;

> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401.  The statute covers civil and criminal contempt, a "somewhat elusive" distinction, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 830 (1994).  Generally speaking, civil contempt is used "to coerce future compliance with a court's order" or to "compensate for the injuries" resulting from misconduct, *In re Jaques*, 761 F.2d 302, 305-06 (6th Cir. 1985), while criminal contempt is "imposed for punitive purposes" and does not "serve to compensate an aggrieved party or coerce a future action." *In re Chandler*, 906 F.2d 248, 249 (6th Cir. 1990); *see also* 3A Charles Alan Wright et al., *Federal Practice & Procedure* § 703 (4th ed.).  In a criminal case, most if not all contempt citations will be punitive and backward-looking.

Rule 42 of the Federal Rules of Criminal Procedure spells out the process for criminal contempt.  Unless the court personally "saw or heard the contemptuous conduct," it must provide notice, allow a reasonable time to prepare a defense, and appoint an attorney to prosecute the contempt.  Fed. R. Crim. P. 42(b), (a).  When it comes to sanctions for attorney misconduct in criminal trials, that is all there is—§ 401 and Rule 42—and one wonders why the federal courts should not leave it at that.

*Chambers*, it is true, held that a federal court is not "forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules."  501 U.S. at 50.  But *Chambers* was a civil, not a criminal, case, and there is a difference between the two.  The conduct in *Chambers* that implicated Civil Rule 11, moreover, was intertwined with "bad-faith conduct . . . beyond the reach of the Rules . . . that only the inherent power could address." *Id.* at 50–51.  In that setting, the Court reasoned, it would "foster extensive and needless satellite litigation" to require a district court to separate out the conduct forbidden by the Rules from conduct sanctionable only through the inherent power. *Id.* at 51.  When a court is faced with conduct *not* intertwined with other conduct outside the purview of the Rules, *Chambers* says that the court "ordinarily should rely on the Rules

rather than the inherent power," resorting to the latter only when "neither the statute nor the Rules are up to the task." *Id.* at 50.

Since *Chambers*, the Court has twice admonished lower courts not to use inherent power to sidestep the Federal Rules of Criminal Procedure. "Whatever the scope of [a court's] inherent power, it does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure." *Carlisle v. United States*, 517 U.S. 416, 426 (1996) (prohibiting district courts from using inherent authority to grant motions for judgment of acquittal filed outside the time limit prescribed by Federal Rule of Criminal Procedure 29(c)); *accord Bank of Nova Scotia v. United States*, 487 U.S. 250, 254–55 (1988). The Rules represent the relevant Rules committees' and Congress's judgment about how best to balance competing values. In *Bank of Nova Scotia*, for instance, the district court tried to use its inherent power to disregard the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a). 487 U.S. at 254. In rejecting that effort, the Court reasoned that "[t]he balance struck by the Rule between societal costs and the rights of the accused may not casually be overlooked because a court has elected to analyze the question under the supervisory power." *Id.* at 255.

Just so here. Like Rule 52, § 401 and Rule 42 balance competing values: to deter and punish offensive conduct on the one hand yet to give criminal defense attorneys the space to represent their clients zealously on the other. The history of the federal contempt statute shows that the tradeoff is not a figment. The Judiciary Act of 1789 gave federal courts the "power . . . to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority." § 17, 1 Stat. at 83. A judge eventually abused this broad grant of power. In 1826, Judge James Peck, of the United States District Court for the District of Missouri, imprisoned and disbarred a lawyer for criticizing his opinion on appeal—a remarkable, if mildly understandable, lapse in judgment. *See* Arthur J. Stansbury, *Report of the Trial of James H. Peck* 2–5 (1833); Benjamin H. Barton, *An Article I Theory of the Inherent Powers of the Federal Courts*, 61 Cath. U. L. Rev. 1, 44–45 & n.315 (2011). In response to public outcry over the

judge's action, Congress imposed new limitations on the federal courts' contempt power. *See* Act of Mar. 2, 1831, ch. 99, § 1, 4 Stat. 487 (establishing the limitations that now appear in 18 U.S.C. § 401(1)–(3)). The next time an attorney criticized one of Judge Peck's rulings on appeal, does anyone think the judge could have disregarded Congress's limitations on the contempt power by invoking his inherent sanctioning authority? Of course not: a judge may not use inherent power to end-run a cabined power.

That leaves the question whether the conduct at issue here—the filing of a frivolous motion to harass a potential witness, so we assume—is the sort of behavior that falls within the purview of, and is thus subject to the limitations imposed by, § 401 and Rule 42. Yes, it seems to me. A criminal defense attorney's conduct amounts to contempt if it satisfies four criteria: (1) it "must constitute misbehavior under 18 U.S.C. § 401(1)"; (2) it "must amount to an obstruction of the administration of justice"; (3) it "must occur in the court's presence"; and (4) "there must be a form of intent to obstruct." *Chandler*, 906 F.2d at 249. If a criminal defense attorney files a frivolous motion with no motive other than to obstruct proceedings or intimidate a witness, the contempt power potentially covers the conduct—and would be accompanied by the procedural protections of Rule 42, including the requirement that the attorney's guilt be proved beyond a reasonable doubt. *See In re Smothers*, 322 F.3d 438, 442 (6th Cir. 2003).

Why didn't the district court invoke that power here? It does not say. But the most likely explanation is that Freeman's conduct fell short of what § 401 and Rule 42 require, perhaps because his improper motive could not be proved beyond a reasonable doubt. If so, that is just the sort of "circumvent[ion]" of the Rules that the Court warns us not to permit. *Carlisle*, 517 U.S. at 426; *Bank of Nova Scotia*, 487 U.S. at 254. A court's inherent power to sanction is not a second-division contempt power to be used when an attorney's conduct is almost, but not quite, punishable under § 401 and Rule 42. If a court is to invoke its inherent power to punish attorneys at all in the criminal context, it must be in response to conduct categorically beyond the scope of the contempt power.

In that case, a court resorting to its inherent power is not circumventing any limitations the Rules impose; it is addressing a situation not contemplated by the Rules at all.

The government calls our attention to a handful of cases in which other courts of appeals approved the use of inherent-power sanctions in criminal cases. But these cases illustrate our point. The government cites no case, nor have we found one, in which a court of appeals affirmed a district court's use of its inherent power to impose sanctions on an attorney for filing a frivolous motion in a criminal case. The cited cases either *reverse* sanctions orders, *see United States v. Gonzalez-Lopez*, 403 F.3d 558, 564–67 (8th Cir. 2005); *United States v. Figueroa-Arenas*, 292 F.3d 276, 279–82 (1st Cir. 2002), or concern attorney misconduct unrelated to advancing legal arguments, *see United States v. Kouri-Perez*, 187 F.3d 1, 4–5, 9 (1st Cir. 1999) (attorney made baseless ad hominem attacks on prosecutor, including an allegation that she was the granddaughter of former Dominican Republic dictator Rafael Trujillo); *United States v. Wallace*, 964 F.2d 1214, 1215–16, 1218 (D.C. Cir. 1992) (attorney neglected to call witnesses to appear, forcing trial to be rescheduled); *see also United States v. Romero-Lopez*, 661 F.3d 106, 107–08 (1st Cir. 2011) (attorney failed to show up for scheduled sentencing hearing); *Bills v. United States*, 11 F. App'x 342, 342–43 (4th Cir. 2001) (per curiam) (same). When it comes to court filings, Congress and the Rules makers struck a context-specific balance when they included Rule 11 in the Civil Rules and omitted any parallel sanction in the criminal context. The most natural inference to draw from the contrast is that, if courts wish to punish criminal defense attorneys for improper filings, they should satisfy the strictures of the contempt power, not rework this balance however they see fit under their inherent power.

But inferences from silence, even seventy-five years of silence, contain risks of their own. Rather than take the position that lower federal courts may *never* invoke an inherent sanctioning power when it comes to frivolous filings in criminal cases, the better part of valor is to suggest that a district court tempted to invoke its inherent powers ought to resist the urge unless it can satisfactorily address these considerations:

1.    Is there a relevant Criminal Rule?  If so, why not invoke it?

2.    Is there a Civil Rule covering the same conduct?  If so, is it possible that the drafters of the Criminal Rules opted not to impose similar sanctions in criminal cases because the Civil Rule does not lend itself to the criminal context?

3.    If neither the Criminal Rules nor the Civil Rules speak to the issue, should a court impose such sanctions on a case-by-case basis or urge the Advisory Committee on the Federal Rules of Criminal Procedure to invoke the deliberative and inclusive Rules Enabling Act process to consider the adoption of a new Rule? *See* Mark A. Kravitz, *To Revise, or Not to Revise:  That Is the Question*, 87 Denv. U. L. Rev. 213 (2010).

4.    If none of this gives a court pause and if imposing a criminal sanction for a frivolous filing remains consistent with the "restraint and discretion" appropriate for any exercise of inherent judicial power, *Chambers*, 501 U.S. at 44, this is a rare case. And if the court of appeals upholds the sanction, it may be a unique one.