**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 16a0356n.06

**Case Nos. 15-3496/3510/3511/3512/3513/3519**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Jun 29, 2016<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| GARY J. WYMER; TERRANCE L. WYMER; | ) | NORTHERN DISTRICT OF |
| GARY G. WYMER, JR.; ROBERT W. | ) | OHIO |
| DEBOLT, JR.; JOHN A. DEBOLT; | ) | |
| MICHAEL G. WYMER, | ) | |
| | ) | |
| Defendants-Appellants. | ) | **O P I N I O N** |

**BEFORE: McKEAGUE and GRIFFIN, Circuit Judges; BERTELSMAN, District Judge.***

**McKEAGUE, Circuit Judge.** Michael Wymer, Gary Wymer Sr., Robert Debolt, Gary Wymer Jr., Terrance Wymer, and John Debolt all took part in a large-scale chop-shop operation based in Toledo, Ohio that resulted in criminal charges for fourteen individuals. These six defendants raise numerous challenges to their convictions and their sentences. For the reasons below, we affirm all challenged convictions and sentences.

---

*The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I. Background

### A. The Conspiracy

After Michael Wymer completed a state sentence for possessing a stolen loader in June 2011, he immediately resumed his chop-shop operation. He enlisted various family members to assist him, including the five other defendants in this case: Gary Wymer Sr., Robert Debolt, Gary Wymer Jr., Terrance Wymer, and John Debolt. They began stealing trucks and trailers loaded with scrap metal from highway rest stops and other locations in Ohio, Michigan, and Indiana. The men brought the stolen items to their facilities in Toledo, Ohio to chop the trucks and trailers into pieces to scrap for a profit.

The defendants identified targets for their thefts in two ways. Most commonly, Robert Debolt would identify a particular truck, trailer, or location to be targeted. Since Robert Debolt was a trucker, he frequently observed semi-trucks and trailers that could profitably be stolen and chopped into pieces that could then be scrapped. Alternatively, Michael Wymer and an accomplice (often Robert Debolt) would travel along one of a handful of routes within a several hundred mile radius of Toledo, usually late at night. They would stop and loiter at rest stops, motels, and other locations where drivers parked their tractors and trailers overnight.

Upon finding an unattended truck or trailer, they would haul it back to one of two facilities: a facility owned by Michael Wymer on Sterling Street or one owned by Gary Wymer Sr. on Consaul Street. Both locations were secured with locked gates, so Michael Wymer routinely called other family members to meet him to open the gate when he brought the stolen items back. The next morning, the family work-crew would dismantle the trucks and trailers. Vehicle identification numbers (VINs) and other identifying information were removed from the trucks, trailers, and other stolen items. Within a few days of the theft, the entire truck and trailer

were cut into small pieces, cleaned of any identification, and taken to local scrapyards to be exchanged for cash. Larger items were taken to the Consaul Street facility where Gary Wymer Sr. would dismantle them for re-use or crush them for scrapping. The contents of the trailers were repackaged and taken to a scrapyard in Pennsylvania, sold on Craigslist, or kept for personal use.

### B. The Investigation

In August 2012, law enforcement received an anonymous tip about a stolen truck operation in northwest Ohio. The tip specifically named Michael Wymer as the person running the operation. The investigators found a truck yard at 623 Sterling Street in Toledo, Ohio that they suspected might be the one referenced by the tipster. They attempted to conduct physical surveillance, but they were generally unsuccessful because the yard and buildings were open to the adjacent streets and Michael Wymer was aggressive about confronting any loitering vehicles.

*Pole Camera.* On September 20, 2012, investigators installed a pole camera to watch the traffic moving in and out of the yard. The pole camera was installed on a telephone pole outside of the Sterling Street property on Center Street, looking east towards the building. The camera would capture vehicles as they entered the open area from either the Sterling Street driveway or the Center Street driveway. It also captured any vehicle parked in the open work-yard area.

At trial, the government introduced photographs and brief video clips from the pole camera footage. These exhibits showed stolen trucks or trailers returning to or parked at the Sterling facility within hours of having been stolen. The stolen items were readily identifiable by distinctive paint schemes, company logos, product serial numbers, or other unique features. The pole camera footage also showed Michael Wymer and his crew processing the stolen cargo and dismantling the stolen trucks and trailers.

*Physical Surveillance*.  On several occasions, law enforcement officers also went to the Sterling facility and observed stolen trucks and trailers in person.  For example, after a theft in early October 2012, one of the agents observed a stolen truck in the yard area with "Bunn Transportation" painted on the door.  Soon after, Terrance Wymer came into the yard and scraped off the lettering.  On other occasions, the officers intercepted or made visual contact with the stolen vehicles as they were being brought back to Toledo.  And on November 14 and 17, 2012, a surveillance camera at a Super 8 motel in Austintown Township, Ohio recorded Michael Wymer casing a vehicle, breaking into the cab, and driving away.

*GPS and Cell Phone Records.*  Investigators also obtained a warrant to place a GPS device on Michael Wymer's personal car and the semi-truck that he used to commit many of the thefts.  Through the GPS trackers, the investigators discovered that Michael Wymer and the other defendants were also operating out of Gary Wymer Sr.'s facility at 2322 Consaul Street in Toledo, Ohio.

The GPS data showed that Michael Wymer's car or truck was at the site of almost all of the charged thefts at the time of each theft.  Footage from the pole camera would show that sometime soon after each theft, but almost always during the middle of the night, a semi-truck or trailer would enter the Sterling Street location.  Often the truck or trailer would be pulled into the garage and the lights turned off.  The next morning, a team of workers would arrive and engage in a flurry of activity for several days as the stolen cargo was repackaged for transportation and sale and as the stolen truck or trailer was cut into small, untraceable pieces for scrap.

Additionally, investigators examined cell phone numbers collected via grand jury subpoenas and search warrants.  The evidence showed that Michael Wymer's cell phone made or received phone calls using cell towers in close proximity to many of the thefts during the time of

the thefts. The records, along with witness testimony, also established that Michael Wymer regularly called his co-conspirators while returning with a stolen truck in order to have them open the gate for him to pull into the Sterling facility.

*Search of Facilities*. Investigators concluded their surveillance in January 2013. They determined that between August 2012 and January 2013, the conspirators had engaged in twenty-four separate incidents of theft of trailers, semi-tractors, and cargo. Investigators executed a search warrant on the Sterling facility in February 2013. The search uncovered a video surveillance system at the Sterling facility. Michael Wymer had installed the system because he thought that his own employees were stealing from him, and so he set it up to capture both the inside and outside of the garage facility. This system recorded approximately six weeks of activity, spanning from early November through the middle of December of 2012. Law enforcement recovered the hard drive for the surveillance system with the recorded video when they searched the Sterling facility in early February 2013. The hard drive had numerous video recordings of Michael Wymer and his accomplices bringing stolen trucks and trailers onto the Sterling site. It also contained recordings of Michael Wymer and his crew dismantling numerous stolen items and processing the stolen loads of cargo for scrap.

After executing the search warrant, investigators were also able to trace items from several of the thefts to the Sterling property. For example, Patrick June left a jacket bearing his name and company logo in his truck when he parked it in Adrian, Michigan the night of December 16, 2012. His truck was stolen soon after. The GPS data showed that Michael Wymer's car was at the scene of the theft that night, and June's jacket and other belongings were found at the Sterling facility during the search. Officers also found remnants of several stolen trucks and loads of cargo. For example, red side pieces from a trailer stolen from Anna, Ohio

were found at the Sterling garage. Similarly, a seat from a truck stolen from Holiday City, Ohio was found there. Pieces of steel stolen in January 2013 were also recovered.

### C. Procedural History

The first indictment was filed on March 7, 2013. A superseding indictment was filed on June 12, 2013. A final, second superseding indictment was filed on February 11, 2014.

*Michael Wymer.* Michael Wymer was the ringleader of the chop-shop conspiracy. He went to trial and was found guilty of one count of conspiracy to defraud the government by committing theft of interstate shipments; four counts of interstate transportation of stolen vehicles; eight counts of interstate transportation of stolen goods; and two counts of theft of interstate shipments by carrier. He was sentenced to 60 months' imprisonment for the conspiracy count and 120 months' imprisonment on each of the remaining seven counts, with the sentences to run concurrently, followed by a three-year term of supervised release.

*Gary Wymer Sr.* Gary Wymer Sr. is Michael Wymer's brother. He owned a salvage yard business on Consaul Street in Toledo. He assisted Michael Wymer by accepting seven stolen trailers for processing into scrap metal during a five-week period in late 2012. He was convicted by a jury of conspiracy. He was sentenced to 60 months' imprisonment, followed by a two-year term of supervised release.

*Gary Wymer Jr.* Gary Wymer Jr. is Gary Wymer Sr.'s son and Michael Wymer's nephew. He operated his own scrapping business out of his father's scrapyard on Consaul Street. He knew of the conspiracy, and on one occasion he and his cousin Terrance Wymer knowingly took a load of stolen scrap from Michael Wymer's scrapyard to sell. He pleaded guilty to conspiracy. He was sentenced to 48 months' imprisonment followed by a two-year term of supervised release.

*Robert Debolt*.  Robert Debolt acted as a driver and a lookout for Michael Wymer when Michael Wymer stole property.  He also participated in the thefts, driving loads of stolen cargo to a scrapyard in Pennsylvania.  Robert Debolt was charged with conspiracy, two counts of interstate transportation of stolen vehicles, three counts of interstate transportation of stolen property, and two counts of stealing goods and property from an interstate freight shipment.  His trial was scheduled to begin on September 22, 2014, but that morning he pleaded guilty to all of the charges against him.  He was sentenced to 120 months' imprisonment followed by a three-year term of supervised release.

*Terrance Wymer*.  Terrance Wymer is Michael Wymer's nephew.  His primary role was to take cut-up stolen pieces of metal to scrapyards for Michael Wymer.  He was caught taking several stolen items with intact VINs to a local scrapyard for Michael Wymer.  He appeared on one occasion in a surveillance video participating in the dismantling of a stolen vehicle with a cutting torch.  After one theft, he was seen scraping decals off of a stolen truck.  Terrance Wymer was entrusted to help Michael Wymer safely return to the facility with stolen items by opening the gate.  He was also observed helping to unload and hide a load of stolen ATVs and motorcycles.  He was charged with conspiracy.  He pleaded guilty.  He was sentenced to 60 months' imprisonment followed by a two-year term of supervised release.

*John Debolt*.  John Debolt was a part-time employee of Michael Wymer at the Sterling facility.  He worked as a torcher, performing both legal and illegal acts during his employment.  As part of the criminal enterprise, he used a torch to obliterate VINs from stolen goods and used a saw to dismantle trucks and cut up stolen cargo.  He was charged with conspiracy.  He went to trial and was found guilty.  He was sentenced to 60 months' imprisonment followed by a two-year term of supervised release.

We begin by addressing the arguments of Michael Wymer and Gary Wymer Sr. attacking their convictions. Next, we will address the claims of Terrance Wymer, Gary Wymer Sr., Gary Wymer Jr., Robert Debolt, and John Debolt that their sentences are procedurally unreasonable. Finally, we will evaluate the substantive reasonableness of Robert Debolt's and Terrance Wymer's sentences.

## II. The Convictions

Michael Wymer brings a Fourth Amendment claim regarding evidence from a pole camera. Gary Wymer Sr. brings a sufficiency of the evidence claim.

### A. Fourth Amendment Claim

Michael Wymer appeals the district court's denial of his motion to suppress pole camera footage and the fruits of that search. He claims that the pole camera video surveillance constitutes an illegal search on his property in violation of his Fourth Amendment rights. When reviewing the denial of a motion to suppress, we review a district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000). All evidence must be viewed "in the light most likely to support the district court's decision." *Id.*; *see also United States v. Montgomery*, 377 F.3d 582, 585 (6th Cir. 2004) ("When considering the denial of a suppression motion, we must view the evidence in the light most favorable to the government.").

In the spring of 2012, Michael Wymer bought two adjoining industrial parcels on Sterling Street in Toledo, Ohio. The Sterling Street facility would become the center for his chop-shop operation for the next year. The site fronted on two streets, with the primary entrance off Sterling Street and a long open yard and driveway extending westward to Center Street. In the southwest corner of the lot was a second business's facility, Klosterman's Bakery, which shared

the Center Street driveway and gate. The Klosterman's loading dock abutted the work-yard area, and Klosterman's trucks traveled through and parked on the open space. A chain-link fence surrounded the property, but passersby on both Center Street and Sterling Street had unimpeded visual access to the central open area and driveways, right up to the garage buildings.

Investigators installed a pole camera on a telephone pole outside of the Sterling Street facility. The pole camera became operational on September 20, 2012. Over the next several months, the agents recorded Michael Wymer bringing more than two dozen stolen trucks and trailers into the open yard area. In addition, footage from the pole camera showed the men dismantling several stolen trailers, using forklifts to move stolen trucks and loads of cargo, and emptying a trailer full of stolen aluminum shavings to repackage for scrapping.

Michael Wymer filed a pre-trial motion seeking suppression of the pole camera footage, claiming that it violated his Fourth Amendment rights. At the time, our court had not definitively ruled on whether such use of pole cameras fell under the purview of the Fourth Amendment. *See United States v. Anderson-Bagshaw*, 509 F. App'x 396, 403–06 (6th Cir. 2012) (holding that video recording of the defendant's residential property from a pole camera did not implicate the Fourth Amendment because the areas of the property that were recorded were either not part of the curtilage or were visible from a publicly accessible location, but expressing "some misgivings about a rule that would allow the government to conduct long-term video surveillance of a person's backyard without a warrant"). The district court, however, presciently denied Michael Wymer's motion to suppress, concluding that he lacked a legitimate expectation of privacy in the space filmed by the pole camera because the facility was a commercial site that was open to the public.

*Placement.* We recently held that a property owner has "no reasonable expectation of privacy in video footage recorded by a camera that was located on top of a public utility pole and that captured the same views enjoyed by passersby on public roads." *United States v. Houston*, 813 F.3d 282, 287–88 (6th Cir. 2016). Here, the pole camera was placed upon a public telephone pole. The district court found that the space captured by the pole camera was fully visible to the public on two sides. Michael Wymer does not contest that the space was visible to a person looking into the yard of the property. Thus, under our precedent, he does not have a reasonable expectation of privacy in this area that was both visible by "any person traveling on the roads surrounding the [property]" and was recorded by a camera located on a public telephone pole. *Id.*; *see also California v. Ciraolo*, 476 U.S. 207, 213 (1986) (upholding warrantless aerial observations of the curtilage of a home because the Fourth Amendment does not "preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible"); *Katz v. United States*, 389 U.S. 347, 351 (1967) (holding that there is no reasonable expectation of privacy in what a person "knowingly exposes to the public"). Indeed, this case presents even less of a privacy interest. The pole camera in *Houston* was trained on a trailer where law enforcement knew that the defendant "spent most of his time" and "occasionally slept." *Id.* at 286. Here, however, the pole camera was recording activity on *commercial* property. "An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 699 (1987) (citing *Donovan v. Dewey*, 452 U.S. 594, 598–99 (1981)).

*Length of Time.* Michael Wymer argues that the length of time that the pole camera recorded means that "it is unlikely one person could maintain the schedule of the pole camera. Rather, there would have to be several people rotating the view." M. Wymer Br. 7, M. Wymer

Reply Br. 3–4. Thus, he argues, the search was unconstitutional. The pole camera in question recorded for approximately five months. But, "the length of the surveillance d[oes] not render the use of the pole camera unconstitutional, because the Fourth Amendment does not punish law enforcement for using technology to more efficiently conduct their investigations. While the [officers] could have stationed agents round-the-clock to observe [the defendant's property] in person, the fact that they instead used a camera to conduct the surveillance does not make the surveillance unconstitutional." *Houston*, 813 F.3d at 288. "[E]ven if it were not practical for [law enforcement] to conduct in-person surveillance for" the entire period of the pole camera recording, "it is only the *possibility* that a member of the public may observe activity from a public vantage point—not the actual practicality of law enforcement's doing so without technology—that is relevant for Fourth Amendment purposes." *Id.* at 289 (emphasis added). Thus, the length of the use of the camera is not problematic "because any member of the public driving on the roads bordering" Michael Wymer's property during the period in question "could have observed the same views captured by the camera." *Id.*

Therefore, we affirm the district court's denial of Michael Wymer's motion to suppress.

### B. Sufficiency of the Evidence Claim

Gary Wymer Sr. claims that there was insufficient evidence to convict him of conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. "This court reviews de novo a claim of insufficient evidence, assessing the evidence 'in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Mack*, 808 F.3d 1074, 1080 (6th Cir. 2015) (quoting *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008)). Thus, we will make all reasonable inferences and resolve all issues of credibility in favor

of the jury's verdict. *Id.*; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A defendant challenging the sufficiency of the evidence has a "very heavy burden." *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007). "We will reverse a judgment based on a finding of insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *Campbell*, 549 F.3d at 374.

Gary Wymer Sr. was convicted of conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. To sustain a conviction for conspiracy, "the government must prove beyond a reasonable doubt that there was an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *Mack*, 808 F.3d at 1080 (quoting *United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004)) (internal quotation marks omitted). The government alleged that the conspiracy had three object offenses: to transport stolen vehicles in interstate commerce in violation of 18 U.S.C. § 2312, to transport stolen property in interstate commerce in violation of 18 U.S.C. § 2314, and to steal goods from an interstate freight shipment and then to possess those items in violation of 18 U.S.C. § 659. When reviewing a multiple-object conspiracy conviction for sufficient evidence, it is constitutionally adequate if there is sufficient evidence to support the conspiracy charge on any one of the object offenses. *Griffin v. United States*, 502 U.S. 46, 49–50, 57 (1991).

Gary Wymer Sr. argues that the government did not prove that he entered into an agreement to participate in a wrongful activity. He claims that there was only sufficient evidence to show that he aided and abetted by giving substantial assistance to Michael Wymer. Aiding and abetting and conspiracy are related but not synonymous crimes. *United States v. Tate*, 136 F. App'x 821, 828 n.6 (6th Cir. 2005). While "conspiracy involves an *agreement* to participate in a wrongful activity, . . . aiding and abetting can be accomplished if the defendant knowingly

gave substantial assistance to someone who performed wrongful conduct, *even if the defendant did not necessarily agree to join in the conduct.*" *United States v. Thompson*, 501 F. App'x 347, 361 (6th Cir. 2012) (citing *Aetna Cas. & Sur. Co. v. Leahey Constr.*, 219 F.3d 519, 534 (6th Cir. 2000)) (emphasis added).

Here, however, there was sufficient evidence by which a rational trier of fact could have found that Gary Wymer Sr. entered into an agreement with Michael Wymer to commit an offense. "The element of agreement . . . is nearly always established by circumstantial evidence, as conspirators seldom make records of their illegal agreements." *United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982). "Circumstantial evidence is entitled to the same weight as direct evidence." *Mack*, 808 F.3d at 1080 (quoting *United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993)). Circumstantial evidence alone is sufficient to sustain a conviction and "need not remove every reasonable hypothesis except that of guilt." *Id.* (quoting *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010)).

Gary Wymer Sr. owned a salvage facility on Consaul Street. During a five-week period in late 2012, he assisted Michael Wymer by accepting seven stolen trailers for processing into scrap metal. Gary Wymer Sr. admitted to investigators that he stored trailers and loads of cargo for his brother Michael Wymer, knowing that they were stolen and knowing that he was taking part in an illegal activity. When Michael Wymer brought a stolen trailer and cargo loads to the Consaul facility, Gary Wymer Sr. was present to unlock the gate and allow him entrance. Michael Wymer's son testified that Gary Wymer Sr. came to the Sterling facility and obtained stolen items and cargo loads from stolen trailers. Gary Wymer Sr. also used his crushers and heavy machinery at the Consaul facility to break the stolen trucks and trailers into smaller pieces for scrapping. He enlisted his son, Gary Wymer Jr., to transport material to local scrapyards to

convert it into cash. And, on one occasion, he assisted Robert Debolt in successfully transporting a load of stolen aluminum to Pennsylvania.

Thus, Gary Wymer Sr. was not only aware that his brother Michael Wymer was involved in an illegal chop-shop operation, he was an active participant in it. Looking at the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Gary Wymer Sr. had joined a conspiracy to commit an offense against the United States. Accordingly, we affirm Gary Wymer Sr.'s conviction for conspiracy.

### III. Procedural Reasonableness

Five of the six defendants attack the procedural reasonableness of their sentences: Terrance Wymer, Gary Wymer Sr., Gary Wymer Jr., Robert Debolt, and John Debolt.[1] Terrance Wymer attacks the district court's determination of the number of victims and the total loss inflicted by the conspiracy. Gary Wymer Sr. brings the same claim regarding the number of victims, as well as claims related to the district court's determination that he was responsible for the entire loss and a claim that the district court erred in imposing a role enhancement to his base offense level. Gary Wymer Jr. and John Debolt only bring claims related to the district court's determination that they were responsible for the entire loss inflicted by the conspiracy. Robert Debolt brings these claims as well, and additionally argues that the district court erred in denying him a reduction in his offense level for accepting responsibility.

We review the procedural reasonableness of a sentence for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). The district court must correctly calculate the applicable Guidelines range; must treat the Guidelines as advisory, not mandatory; must consider the

---

[1] John Debolt characterizes his claim as one of substantive reasonableness. His argument, however, is one of procedural reasonableness, because he is arguing that his sentence is based upon an incorrect Guidelines range. *See United States v. Volkman*, 797 F.3d 377, 399 (6th Cir. 2015).

statutory sentencing factors set forth in 18 U.S.C. § 3553(a); may not select a sentence based on clearly erroneous facts; and must adequately explain the chosen sentence to show that it has considered the parties' arguments and has a reasoned basis for the sentence. *United States v. Kemper*, 748 F.3d 728, 739 (6th Cir. 2014); *Rita v. United States*, 551 U.S. 338, 356 (2007). We review the sentencing court's legal conclusions *de novo* and its findings of fact for clear error. *United States v. Cunningham*, 669 F.3d 723, 728 (6th Cir. 2012).

## A. The Victim Count

Terrance Wymer and Gary Wymer Sr. claim that the district court erred in imposing a four-level increase to their offense levels under U.S.S.G. § 2B1.1(b)(2)(B) for offenses of theft involving fifty or more victims.[2] They argue that the district court incorrectly included two categories of victims: (1) insurance companies and (2) individuals whose losses were not included in the loss amount calculated pursuant to U.S.S.G. § 2B1.1(b)(1).

"Whether a person is a victim under the Sentencing Guidelines is a legal conclusion [that appellate courts] review de novo." *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012) (quoting *United States v. Ellisor*, 522 F.3d 1255, 1275 (11th Cir. 2008)) (alteration in original). The government bears the burden to "prove, by a preponderance of the evidence, that a particular sentencing enhancement applies." *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003).

A victim for purposes of U.S.S.G. § 2B1.1(b)(2) is "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1, comment. (n.1). Actual loss is defined as "the reasonably foreseeable pecuniary harm." *Id.* at comment. (n.3(A)(i)). Pecuniary

---

[2] The 2014 Sentencing Guidelines are the relevant Guidelines in this case. 18 U.S.C. § 3553(a)(4)(A)(ii); *see also* U.S.S.G. § 1B1.11.

harm means harm that is "monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm." *Id.* at comment. (n.3(A)(iii)). Reasonably foreseeable pecuniary harm is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* at comment. (n.3(A)(iv)).

### i. Insurance Companies

Terrance Wymer and Gary Wymer Sr. object to the district court's determination that twenty-two insurance companies were victims.[3] They argue that including both the insurance companies and the owners covered by the insurance policies double-counts the victims.

*Not Double-Counting Because Both Have Losses*. Terrance Wymer compares this case to *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005). In *Yagar*, the defendants had fraudulently obtained money from the bank accounts of forty-seven individuals. Because the banks immediately reimbursed the individuals, we ruled that the banks were victims but the individual account holders were not. *Id.* at 971. We stated that:

> In our view, these account holders are not "victims" under the Guidelines because they were fully reimbursed for their temporary financial losses. While there may be situations in which a person could be considered a "victim" under the Guidelines even though he or she is ultimately reimbursed, in situations such as this, where the monetary loss is short-lived and immediately covered by a third-party, we do not think that there has been "actual loss" or "pecuniary harm." In sum, the account holders here suffered no adverse effect as a practical matter from Yagar's conduct.

*Id.* Here, however, the thefts were not of fungible goods and the owners of the stolen property were not immediately reimbursed. *See United States v. Erpenbeck*, 532 F.3d 423, 442 (6th Cir. 2008) (distinguishing *Yagar* because "[i]n the present case, . . . the homeowners had no contract

---

[3] Terrance Wymer claims that there are twenty, twenty-one, or thirty-one insurance companies. T. Wymer Br. 5, 9, 10. The government states that there are twenty. T. Wymer Gov. Br. 15. After reviewing the record, we have identified twenty-two insurance companies.

with a third party to cover their loss, nor was the loss short-lived. The homeowners were saddled with many thousands of dollars of debt, often for great lengths of time, while they attempted to have the construction liens removed. Most of the homeowners eventually had to undertake a class-action lawsuit to seek relief"); *United States v. Lee*, 427 F.3d 881, 895 (11th Cir. 2005) (holding that persons can be counted as victims even if they were fully reimbursed for their losses as long as the losses were "neither short-lived nor immediately covered by third parties").

*Insurance Companies Suffer Loss*. Terrance Wymer argues that insurance companies are not victims because they do not suffer pecuniary harm. Specifically, he argues that "the insurance enterprise, by its very nature, is merely a loss-shifting mechanism," and so "an insurance company has already recouped the gross value of its payouts—together with a profit—by collecting policy premiums from its policy holders, including those who sustain a loss and those who do not." T. Wymer Br. 11. This ignores the fact, however, that insurance companies *are* among those harmed—had the trucks and other insured items not been stolen, the insurance company would not have had to pay the owners. Paying the owners money that the insurance companies would otherwise have kept is, by definition, pecuniary loss.

He also argues that including insurance companies as victims would result in sentencing disparities and unfairness, because thefts of insured items would have twice as many victims as non-insured items. This is unpersuasive, because those who steal vehicles "knew or, under the circumstances, reasonably should have known" that this "was a potential result of the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(iv)). The Sentencing Commission chose to use the number of victims as the basis of the enhancement, not the number of items stolen. Insurance companies are not an unexpected victim when stealing semi-trucks, trailers, and cargo—items that are normally insured.

Therefore, insurance companies are victims under U.S.S.G. § 2B1.1(b)(2), and so the district court did not err in including the insurance companies in the victim count.

### ii. Individuals Whose Losses Were Not Included in the Loss Calculation

Terrance Wymer and Gary Wymer Sr. also object to the district court's inclusion of persons whose losses were not included in the district court's loss calculation under § 2B1.1(b)(1) as victims under § 2B1.1(b)(2). The contested victims are: three relatives of owners, four employees of owners, and eleven other individuals.

Because we hold that the insurance companies are victims, any error that may have occurred by including these eighteen individuals in the victim count is harmless. Even without these eighteen persons, the defendants would still be subject to the four-level increase for an offense involving fifty or more victims under U.S.S.G. § 2B1.1(b)(2)(B) because the district court found that there were seventy-three victims in total. *See United States v. Bivens*, 811 F.3d 840, 843 (6th Cir. 2016); *United States v. Davis*, 751 F.3d 769, 773 (6th Cir. 2014) ("Sentencing errors are harmless where this court is convinced that the 'error at sentencing did not cause the defendant to receive a more severe sentence' than would have existed without the error." (quoting *United States v. Gillis*, 592 F.3d 696, 699 (6th Cir. 2009)); Fed. R. Crim. P. 52(a).

### B. Methodology to Calculate Pre-Indictment Loss

Terrance Wymer challenges the methodology employed by the district court to estimate the loss imposed by the conspiracy in the time before the dates of the conspiracy count in the indictment. The district court need only make a reasonable estimate of the loss. U.S.S.G. § 2B1.1, comment. (n.3(C)); *United States v. Warshak*, 631 F.3d 266, 329 (6th Cir. 2010). Loss determinations for stolen items that are scrapped or rendered untraceable are entitled to particular deference due to the inherently difficult and fact-specific nature of the calculation. U.S.S.G.

§ 2B1.1, comment. (n.3, backg'd.).  We review the district court's factual determination of the loss amount only for clear error.  *See United States v. Collins*, 799 F.3d 554, 592–93 (6th Cir. 2015).

The government's active investigation did not begin until August 2012, and the indictment period did not start until June 2012.  The conspiracy's illegal activities began, however, around June 2011.  Because the stolen items were chopped up and sold for scrap with all identifying marks removed, law enforcement was unable to attribute particular thefts to the conspiracy during this pre-indictment period.  The case agent, Special Agent Cruz, testified that he had developed a formula to determine the amount of loss caused by the conspiracy during the pre-indictment period.  His formula was based on the assumptions that an unknown number of thefts had occurred during this period and that all of the revenue received by the lead conspirators from scrapyards during this period ($166,000) was derived from scrapping stolen trucks.  Agent Cruz testified that the scrap value for any given stolen vehicle is a fraction of the vehicle's pre-scrap value.  By evaluating three random thefts from the indictment period, he estimated that fraction to be between 10–20%.  Using these ratios and the scrapyard revenue, Agent Cruz estimated that there were between $1,660,000 and $3,300,000 in stolen vehicles.  The government proposed the low end of the range, $1,660,000.  The district court reduced this proposed amount by approximately one-half, to $800,000.

Terrance Wymer challenges the assumption that all of the revenue received from the scrapyards by the lead conspirators during this period was from scrapping stolen trucks.  However, Agent Cruz testified that he could identify pieces of trailers in photos of the scrap subpoenaed from the scrapyards.  He also testified that there was no indication that the conspirators were making any money in any legitimate way during the pre-indictment period and

that several of the cooperating conspirators had confirmed that there was no legitimate business during the pre-indictment period. The district court's determination that, "if anything was earned legitimately, it was such a miniscule amount that it simply plays no role in these calculations" is not clearly erroneous. R. 528, Presentencing Tr. at 183, Page ID 6081.

Terrance Wymer argues that Agent Cruz's formula results in "an absurdly high" estimate for the number of thefts during the pre-indictment period. T. Wymer Br. 20–21 ("Based on an average trailer pre-scrap value of $21,425.00, to reach [Agent Cruz's estimate of between $1,660,000 and $3,300,000] the conspirators had to steal *between 77 and 154 trailers during the seven month pre-investigation period*."). First, Agent Cruz used the revenue collected during a seven-month period to estimate the losses in a year-long period. That is, the $166,000 of revenue occurred from January through July 2012. The pre-indictment period, however, ran from June 2011 to June 2012. Second, the $166,000 is just for items redeemed on the account of Michael Wymer, and not any other co-conspirator. Additionally, Agent Cruz's loss estimate does not include any estimate for stolen cargo. And, most importantly, the district court took Agent Cruz's lower estimate and then halved it, resulting in a pre-indictment loss of $800,000. To reach $800,000 based on an average trailer pre-scrap value of $21,425, the conspirators would only have had to steal around thirty-two trailers during the one-year pre-indictment period (or during the seven-month period in which the revenue was received). This is hardly an unreasonable estimate, given that they stole twenty-four trucks during the six-month active investigation period.

Therefore, the district court did not clearly err in calculating the pre-indictment loss rendered by the conspiracy.

## C. Relevant Conduct

Gary Wymer Sr., Robert Debolt, Gary Wymer Jr., and John Debolt all raise claims regarding the district court's determinations that they were subject to sentencing enhancements for the amount of loss and number of victims. A defendant is only responsible for "relevant conduct." U.S.S.G. § 1B1.3. Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," and "in the case of a jointly undertaken criminal activity . . . , all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1). Thus, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the conspiracy," *United States v. Swiney*, 203 F.3d 397, 402 (6th Cir. 2000), because "the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy," U.S.S.G. § 1B1.3, comment. (n.2).[4]

The district court determined a total loss of $3,081,405.48 and a total of seventy-three victims. This loss figure included an estimated $800,000 loss for the time period preceding the commencement date of the conspiracy count in the indictment. The court ruled that all defendants (except for Robert Debolt and Anthony Wymer) were accountable for the entire loss and total number of victims. Robert Debolt was not accountable for the pre-indictment loss. On

---

[4] Under the *Pinkerton* theory of liability, once a participant decides to join a conspiracy, he is responsible for any substantive offenses committed by his co-conspirators in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647 (1946). Gary Wymer Jr. claims that the probation officer and the district court conflated *Pinkerton* liability with the relevant conduct analysis under U.S.S.G. § 1B1.3. The district court here, however, *expressly stated* that it was not applying the *Pinkerton* rule. R. 507, Presentencing Tr. at 68, Page ID 4185. Rather, the district court made clear that its inquiry was specific to each defendant's involvement in the offense and rested on actions that were reasonably foreseeable to them given the scope of their jointly undertaken criminal activity. *Id.*

appeal, Gary Wymer Sr., Robert Debolt, Gary Wymer Jr., and John Debolt raise similar claims, arguing that the district court failed to make sufficiently specific findings and then improperly held them responsible for the conduct of others.

### i. Specific Findings

At sentencing, the district court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). "As a threshold matter, the defendant must actively raise the dispute during the sentencing hearing before the district court's duty to find facts arises." *United States v. White*, 492 F.3d 380, 415 (6th Cir. 2007) (citations omitted). "Once the defendant calls the matter to the court's attention, the 'court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence.'" *Id.* (quoting *United States v. Solorio*, 337 F.3d 580, 598 (6th Cir. 2003)). "Rather, the district court must affirmatively rule on a controverted matter where it could potentially impact the defendant's sentence." *Id.* (citing *United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997)). We review a district court's compliance with this rule *de novo*, *id.* at 414, and require "literal compliance" with the rule. *United States v. Treadway*, 328 F.3d 878, 886 (6th Cir. 2003).

Here, the district court ruled on the disputed issues.[5] The district court found all defendants (except for Anthony Wymer) responsible for all thefts that occurred during the entire

---

[5] Gary Wymer Sr. argues that the district court failed to make a specific finding regarding when he joined the conspiracy, but he did not "actively raise" to the district court's attention any dispute regarding the date that he entered the conspiracy. Therefore, the district court was under no duty to specifically find that fact and so did not err. *See* Fed. R. Crim. P. 32(i)(3)(A); *White*, 492 F.3d at 415.

indictment period, and found all defendants (except for Anthony Wymer and Robert Debolt) responsible for thefts that occurred during the pre-indictment period. R. 551, Loss Chart at 1–4, Page ID 7019–23.

After this finding, however, none of the four defendants now appealing objected to the specificity or sufficiency of the district court's finding. Nor did they raise this objection when asked the *Bostic* question. "[I]f a sentencing judge asks . . . whether there are any objections not previously raised, in compliance with the procedural rule set forth in *United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004)[,] and if the relevant party does not object, then plain-error review applies on appeal" to those procedural-reasonableness arguments that were not preserved in the district court. *United States v. Penson*, 526 F.3d 331, 337 (6th Cir. 2008) (alterations and internal quotation marks omitted) (quoting *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc)). To establish plain error, a defendant must show (1) error (2) that was obvious or clear, (3) that affected the defendant's substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993).

The district court could have been more specific as to why the thefts that the defendants were not directly involved in were still in furtherance of, and reasonably foreseeable in connection with, the criminal activity they jointly undertook. The defendants, however, have cited no authority indicating that the district court was obliged to go theft-by-theft to determine which thefts were within the scope of each individual defendant's responsibility. We hold that the district court did not commit plain error when it did not go theft-by-theft or defendant-by-defendant but rather found all the defendants (except for Anthony Wymer) responsible for thefts

that occurred during the entire indictment period, and all the defendants (except for Anthony Wymer and Robert Debolt) responsible for thefts that occurred during the pre-indictment period.

Robert Debolt also argues that the district court did not make sufficiently specific findings when it rejected his value estimates for the stolen property. Again, Robert Debolt did not object to the specificity of the district court's finding, and so we review for plain error. The vast majority of loss amounts used by the district court came directly from the victims themselves, whether driver, owner, or insurance company. Most of those claims were submitted under oath, a few were submitted via testimony from the case agent, and for the remainder for which there was no information submitted the case agent consulted an online compendium. This online compendium served as the equivalent of the Kelley Blue Book and is relied upon by law enforcement agencies responsible for these types of cases. Robert Debolt alternatively offered his own valuation of the stolen property. The district court asked him if he could introduce any testimony to explain any discrepancies or assist the court in determining which values he was challenging, but he offered nothing, nor did he seek an adjournment. In fact, Robert Debolt's exhibit did not even identify which values he was challenging, or which theft events corresponded to which items in his list. The district court then accepted the case agent's proffered set of valuations. In doing so, the district court did not plainly err.

### ii. Relevant Conduct

The Sentencing Guidelines instruct district courts to find facts by a preponderance of the evidence. U.S.S.G. § 6A1.3, comment. We review a district court's factual findings for clear error. *Erpenbeck*, 532 F.3d at 433. The Sentencing Guidelines provide guidance on relevant conduct:

> Because a count may be worded broadly and include the conduct of many
> participants over a period of time, the scope of the criminal activity jointly

undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others . . . , the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

U.S.S.G. § 1B1.3, comment. (n.2).

*Gary Wymer Sr.* Gary Wymer Sr. argues that the district court erred in determining that he is responsible for the victims and losses for the entire conspiracy. He first argues that "the earliest possible inception date for Wymer Sr.'s alleged participation in the conspiracy is November [3], 2012." G. Wymer Sr. Br. 21–22.[6] Gary Wymer Sr. was found guilty of conspiracy "as charged in COUNT 1 of the Indictment," R. 342, Judgment at 3, Page ID 2759, which described the conspiracy as "[b]eginning as early as June, 2012 and continuing through February 7, 2013." R. 177, Second Superseding Indictment at 1, Page ID 1193. In his own post-arrest statement, Gary Wymer Sr. acknowledged that his involvement with the chop-shop operation had *increased* beginning in December 2012, and admitted that he had assisted Michael Wymer in his criminal activities on numerous occasions before that. Thus, the district court did not clearly err in finding that Gary Wymer Sr. was involved in the conspiracy from the beginning.

---

[6] Gary Wymer Sr. states that the earliest date is November 5, 2012, but it becomes clear later in his brief that he meant November 3, 2012, the date of the Elyria, Ohio theft. During a five-week period beginning on November 3, 2012, Gary Wymer Sr. assisted Michael Wymer by accepting seven stolen trailers for processing into scrap metal at his Consaul Street facility.

Gary Wymer Sr. also argues that any criminal activity arising out of the Sterling Street facility is outside of the scope of his involvement. First, Gary Wymer Sr.'s criminal activities were not limited to the Consaul Street facility. Trial evidence showed Gary Wymer Sr. at the scene of processing several thefts at the Sterling location, and Michael Wymer's son testified that Gary Wymer Sr. came to the Sterling facility and obtained stolen items and cargo loads from stolen trailers. Second, relevant conduct is not limited to a defendant's *own* conduct. "The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision." U.S.S.G. § 1B1.3, comment. (n.2). Gary Wymer Sr. was heavily involved in the conspiracy, storing stolen trailers and cargos at his facility, using his machinery at the Consaul Street facility to dismantle the stolen items for scrapping, recruiting his son to transport stolen materials to scrapyards, and assisting Robert Debolt in successfully transporting a load of stolen aluminum to Pennsylvania. Given this, the district court did not clearly err in determining that all of the conspiracy's thefts constituted "conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by" Gary Wymer Sr. U.S.S.G. § 1B1.3, comment. (n.2).

*Robert Debolt.* Robert Debolt argues that he "was involved only in a discrete number of thefts and the district court should not have held him responsible for the thefts of others that Debolt did not participate in or facilitate." R. Debolt Br. 21. But a conspirator's relevant conduct is more than just his own conduct—it also includes "conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken." U.S.S.G. § 1B1.3, comment. (n.2). Although "the scope of the criminal activity

jointly undertaken by the defendant . . . *is not necessarily* the same as the scope of the entire conspiracy," U.S.S.G. § 1B1.3, comment. (n.2) (emphasis added), it certainly *can be*.

Robert Debolt pleaded guilty to having assisted in a number of thefts, and was shown to have assisted in several more. He helped haul loads of stolen scrap to Pennsylvania. He used his trailer to hide and transport stolen ATVs. And he used his trailer to help haul most of the stolen cargo loads. He also helped to dismantle and process some of the stolen loads. He would scout out items for Michael Wymer to steal while he was on trips as a truck driver.

Robert Debolt argues that he was only in the conspiracy from September 22, 2012 to January 1, 2013. But evidence shows Robert Debolt's involvement outside of that time period. For example, Robert Debolt's cell phone records indicate that he was involved in a theft in Coldwater, Michigan on the night of August 8, 2012. And he signed a receipt for taking a load of stolen material for Michael Wymer to the scrapyard in Pennsylvania even earlier than that. There is no reason to believe that he exited the conspiracy on January 1, 2013, as his phone records suggest that he was still making runs and helping Michael Wymer after that date. Therefore, the district court did not commit clear error in finding Robert Debolt responsible for all of the losses caused by the chop-shop enterprise during the period charged in the indictment.

*Gary Wymer Jr.[7]* Gary Wymer Jr. maintains that he was only in the conspiracy on February 1, 2013, the date on which he and his cousin Terrance Wymer took a load of items from a stolen semi-truck to a scrapyard in Toledo. Gary Wymer Jr.'s scrapping of these stolen

---

[7] Gary Wymer Jr. argues that this court and the district court are not permitted to consider any co-defendant's trial record because Gary Wymer Jr. pleaded guilty. He asserts that to rely on evidence from the trials in which he did not participate would "run[] afoul of the Confrontation Clause." G. Wymer Jr. Br. 25. This is incorrect, because a defendant does not have a Confrontation right at sentencing. *United States v. Paull*, 551 F.3d 516, 527–28 (6th Cir. 2009); *United States v. Alsante*, 812 F.3d 544, 547 (6th Cir. 2016).

goods was captured on the scrapyard's video camera and was observed by law enforcement officers. Despite Gary Wymer Jr.'s claims, however, this was not the only evidence of his involvement in the conspiracy. Special Agent Cruz testified that he "believe[d] that [Gary Wymer Jr.] was involved the whole period" of the conspiracy. R. 507, Presentencing Tr. at 163, Page ID 4280. Special Agent Cruz based this conclusion on a conversation with Gary Wymer Sr. Gary Wymer Sr. stated that his son's ongoing role in the conspiracy was to take stolen items to local scrapyards. This was confirmed by another co-defendant, Dianna Vannes, who identified Gary Wymer Jr. as one of two individuals whose job in the conspiracy was to redeem stolen material at local scrapyards. When law enforcement attempted to conduct physical surveillance at the Consaul Street facility, Gary Wymer Jr. confronted the officers. When the chop-shop crew stole a trailer of diamond plated steel, Gary Wymer Jr. kept some for his personal use. Accordingly, the district court did not commit clear error when it found that all of the thefts by the conspiracy were relevant conduct for Gary Wymer Jr.

*John Debolt.* John Debolt claims that the district court erred in holding him responsible for the entire loss, arguing that the conduct of others was not relevant conduct because they were not reasonably foreseeable acts taken in furtherance of the jointly undertaken criminal activity. He first argues that foreseeability "should be considered from the Defendant's viewpoint." J. Debolt Br. 21 (citing *United States v. Spotted Elk*, 548 F.3d 641, 674 (8th Cir. 2008)). But reasonable foreseeability is an *objective* test. *See United States v. Catalan*, 499 F.3d 604, 607 (6th Cir. 2007) (discussing a dangerous-weapon enhancement under U.S.S.G. § 2D1.1(b)(1)); *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994) (using an objective test for the reasonable foreseeability of a co-conspirator's conduct). Thus, the district court did not err when it stated that:

> I have no doubt whatsoever that my determination of relevant conduct and the value caused the conspiracy [sic], which was entirely foreseeable on your part given the role you were playing, however occasional, however infrequent . . . I have no doubt whatsoever that . . . any reasonable person would have understood that massive losses were occurring on a routine and regular basis in the amount ultimately that I believe I have estimated.

R. 531, Sentencing Tr. at 176–77, Page ID 6553–54.

Despite John Debolt's claims, the district court did not equate mere knowledge with foreseeability. The district court found that John Debolt was not just aware of the conspiracy, but was "directly and significantly" involved in the criminal enterprise. *Id.* at 177, Page ID 6554. As the district court noted, "[w]ithout anybody to dismantle the trucks, the operation couldn't have gone forward. It's as simple as that." *Id.* As the district court properly reasoned, it was reasonably foreseeable to John Debolt that others would steal trucks and other items when he helped to dismantle the stolen vehicles. Shawn Wymer and others testified that John Debolt was their torcher. He used a torch to obliterate VINs from stolen goods and used a saw to dismantle trucks and cut up stolen cargo. Greg Rose made it clear that every time Michael Wymer stole trucks and trailers, he and John Debolt came to the shop to cut them up and process them. Michael Wymer described John Debolt as one of his two best workers, and one of the two best paid workers in the group.

John Debolt also argues that the district court disregarded "the length and frequency" of his involvement in the conspiracy. J. Debolt Br. 25. The district court, however, found that John Debolt "played a significant, substantial role for a substantial period during the lifetime of this conspiracy. Even if you weren't present day in and day out, that doesn't matter. You provided a useful and necessary service" in dismantling the stolen items. R. 531, Sentencing Tr. at 175, Page ID 6552. Michael Wymer's son, Shawn Wymer, testified that John Debolt was one of the first persons recruited to join the chop-shop enterprise in 2011. John Debolt was identified as

helping unload stolen ATVs taken from Holiday City, Ohio on September 22, 2012. He was also shown helping to process the stolen cargo from three other thefts on different days in mid-November 2012. He injured himself cutting up three stolen aluminum trailers in early January 2013. He returned to work soon after, however, and was working for Michael Wymer in January and February when the group was processing thefts from Seville, Ohio and Holiday City, Ohio. Based on all of the evidence, it was not clear error for the district court to find John Debolt responsible for the entire loss caused by the conspiracy.

Therefore, although these four defendants argue that many of the thefts were perpetrated by others and so are not relevant conduct, they all base their arguments on the fact that they were not directly involved in all of the thefts. A defendant need not be directly involved in a theft, however, so long as the "conduct of others . . . was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by" the defendant. U.S.S.G. § 1B1.3, comment. (n.2). The jointly undertaken criminal activity here was the chop-shop enterprise, not simply the thefts that the defendants directly played a role in. We hold that the district court did not clearly err in finding that all criminal activity during the indictment period was relevant conduct for all four defendants and that all criminal activity during the pre-indictment period was relevant conduct for Gary Wymer Sr., Gary Wymer Jr., and John Debolt.

### iii. Restitution

Gary Wymer Sr., Robert Debolt, and John Debolt all claim that the district court abused its discretion in ordering restitution. Title 18 U.S.C. § 3663A(a)(1) directs the district court to order "that the defendant make restitution to the victim of the offense." The government bears the burden to demonstrate "the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664(e). We review a district court's restitution order for abuse of

discretion. *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006). It is an abuse of discretion if the restitution order rests on an improper loss calculation. *United States v. Joseph*, 914 F.2d 780, 785 (6th Cir. 1990) (per curiam); *see also White*, 492 F.3d at 418 (noting that "a restitution award may not exceed the 'loss caused by the conduct underlying the offense'" (quoting *Hughey v. United States*, 495 U.S. 411, 420 (1990))). The district court has the authority to order a defendant to pay restitution for losses caused by a conspiracy even if the defendant did not directly cause them. *Johnson*, 440 F.3d at 850. Because the district court did not clearly err in calculating the amount of loss for which each defendant was responsible, it did not abuse its discretion in ordering restitution in that amount.

### D. Role Enhancement

When calculating Gary Wymer Sr.'s Guidelines range, the district court imposed a two-level aggravating role enhancement. The Sentencing Guidelines authorize a two-level adjustment if the defendant was an organizer, leader, manager, or supervisor in any criminal activity that involves fewer than five people and was not otherwise extensive. U.S.S.G. § 3B1.1. With the two-level aggravating role enhancement, Gary Wymer Sr.'s offense level was 32. Without it, his offense level would be 30 and the applicable Guidelines range would be 97 to 121 months. Thus, even without the two-level enhancement, his Guidelines range would remain entirely above the 60-month statutory maximum for a conspiracy conviction. As a result, any error is harmless. *See Bivens*, 811 F.3d at 843; *Davis*, 751 F.3d at 773; Fed. R. Crim. P. 52(a).

### E. Acceptance of Responsibility

Robert Debolt claims that the district court erred in denying him credit for accepting responsibility under U.S.S.G. § 3E1.1. Robert Debolt was charged with conspiracy, two counts of interstate transportation of stolen vehicles, three counts of interstate transportation of stolen

property, and two counts of stealing goods and property from an interstate freight shipment. His trial was scheduled to begin on September 22, 2014, but that morning he pleaded guilty to all of the charges against him. A defendant has the burden to show that he was entitled to the adjustment for accepting responsibility. U.S.S.G. § 3E1.1. The district court determined that Robert Debolt had not established that he had accepted responsibility. We review that determination for clear error. *United States v. Genschow*, 645 F.3d 803, 813 (6th Cir. 2011) (citing *United States v. Webb*, 335 F.3d 534, 537–38 (6th Cir. 2003)). Moreover, we apply a deferential scope of review because "§ 3E1.1 determinations involve an overall legal decision that is fact-bound, the district court has comparatively great expertise, and the value of uniform court of appeals precedent is limited." *United States v. Bolden*, 479 F.3d 455, 464 (6th Cir. 2007); *see* U.S.S.G. § 3E1.1 comment. (n.5).

*Admitting Conduct.* When Robert Debolt pleaded guilty, he conceded that there was a sufficient factual basis for the plea. He did not, however, agree with the government's recitation of the factual basis. When the district court asked him where the government "got it wrong," Robert Debolt did not provide any specifics. R. 533, Change of Plea Hearing Tr. at 29–30, Page ID 6653–54 ("How do you say half and half? I mean, half and half. I mean, that's the only answer I can give you. I cannot say that totally 100 percent they're true.").

Robert Debolt met with the probation officer once. A government witness testified that he believed that Robert Debolt had lied in his proffer statement about when he first became involved in the conspiracy. When the probation officer attempted to meet with Robert Debolt a second time in order to discuss the differences between what he proffered and what the government's representations of the evidence were, he refused.

It is an "appropriate consideration[]" whether Robert Debolt had "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 3E1.1 comment. (n. 1(A)) (noting also that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility"). Thus, the district court appropriately considered the fact that Robert Debolt had refused to meet with the probation officer a second time.

*Pleading Guilty the Morning of Trial.* Robert Debolt pleaded guilty, but entry of a guilty plea does not entitle a defendant to an acceptance-of-responsibility adjustment as a matter of right. U.S.S.G. § 3E1.1 comment. (n. 3). The district court appropriately considered the last-minute nature of Robert Debolt's plea. *See* U.S.S.G. § 3E1.1 comment. (n.1(H)).

Robert Debolt argues that timeliness is only a factor in the decision of whether the defendant's acceptance of responsibility warrants a three-level decrease under U.S.S.G. § 3E1.1(b) and that "[t]imeliness is not an essential requirement for the two-point credit under U.S.S.G. § 3E1.1(a)." R. Debolt Br. 29. While it is not an essential requirement, it is explicitly an "appropriate consideration" "[i]n determining whether a defendant qualifies under subsection (a)." U.S.S.G. § 3E1.1 comment. (n.1). We recently had occasion to discuss the difference between the timeliness inquiries under § 3E1.1(a) and § 3E1.1(b) in *United States v. Hollis*, -- F.3d --, 2016 WL 3000350 (6th Cir. May 25, 2015) (per curiam). In *Hollis*, we held that the district court had improperly denied the defendant credit for acceptance of responsibility solely on the basis that the defendant's delay in pleading guilty had imposed preparation costs on the prosecution and the court. *Id.* at *3–4. We specifically noted that:

> District courts may consider the timeliness of a defendant's plea under § 3E1.1(a) only to the extent that timeliness reflects the extent of the defendant's sincerity in accepting responsibility. Waste of government resources may not be considered under § 3E1.1(a). The Sentencing Commission included a mechanism for accounting for the effect that a late-in-time plea may have on wasting the government's resources, and it is found in subsection (b).

*Id.* at *2 (internal citation omitted). Here, the district court considered the timeliness of Robert Debolt's plea in light of his sincerity in accepting responsibility, which is an appropriate consideration.

The district court did not clearly err when it held that Robert Debolt was not entitled to an acceptance-of-responsibility adjustment based off of his refusal to meet a second time with the probation officer and the fact that he waited until the morning of his trial to plead guilty.

*Late Returning to Court.* Robert Debolt argues that the district court actually denied him an acceptance-of-responsibility adjustment because it was displeased with his tardiness returning to the courtroom during sentencing. The district court held hearings over three days to determine the appropriate sentences for Robert Debolt and other co-defendants. On the third day, the district court heard some testimony and then took a short recess before holding several sentencings, including Robert Debolt's. During the recess, Robert Debolt went outside to smoke a cigarette. He was about five minutes late returning to court. The district court reprimanded him, stating that he had "disregard[ed the court's] express order" and that it would "be a factor in [his] sentence and what happened after that." R. 531, Sentencing Tr. at 6, Page ID 6383 (observing that "[i]t's going to be a very expensive cigarette, young man").

Later, however, the district court reconsidered and told Robert Debolt that it would "play no role in my sentence, whatever sentence may be. I would trust my views, and that has nothing to do with the sentence. We're dealing with the crimes that he committed, and their consequences and the punishment appropriate." *Id.* at 198, Page ID 6575. We note, however,

that this reconsideration occurred *after* the district court had already decided that Robert Debolt was not entitled to any credit under § 3E1.1 for accepting responsibility. *Id.* at 183, Page ID 6560.

But when denying Robert Debolt the acceptance-of-responsibility credit, the only reference the district court made to Robert Debolt's tardiness was when it discussed the lateness of his plea. The district court first noted that Robert Debolt's plea on the morning of trial occurred after the plea deadline set by the court in this case. Then the court stated:

> Again, he chose to act in his own clock rather than the one set by The Court. I don't think that somebody who in a case of this magnitude waits until the very last minute and decides then to plead guilty. Under all the circumstances, I don't believe he's entitled to acceptance of responsibility.

*Id.* This is the only evidence that Robert Debolt has provided to show that the court denied him the acceptance-of-responsibility credit *because* he was late returning to court. The district court's statement, however, focuses almost entirely on the lateness of his plea on the day of trial, and not his tardiness in returning to the courtroom. And as discussed above, the district court's consideration of the fact that Robert Debolt did not plead guilty until the morning of his trial was appropriate.

Thus, we hold that the district court did not clearly err in denying Robert Debolt an acceptance-of-responsibility credit.

## IV. Substantive Reasonableness

Robert Debolt and Terrance Wymer both claim that their sentences are substantively unreasonable. Substantive reasonableness concerns the length and type of sentence. *United States v. Camacho-Arellano*, 614 F.3d 244, 247 (6th Cir. 2010). To qualify as substantively reasonable, a sentence "must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes

of § 3553(a)." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (per curiam) (quoting *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008)).

We review a sentence's reasonableness for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Smith*, 516 F.3d 473, 477–78 (6th Cir. 2008). "A sentence falling within the Guidelines range is presumptively reasonable; one falling outside the Guidelines range carries no such presumption." *United States v. Jeter*, 721 F.3d 746, 757 (6th Cir. 2013) (citing *United States v. Herrera-Zuniga*, 571 F.3d 568, 582 (6th Cir. 2009)). We "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007) (quoting *Gall*, 552 U.S. at 51). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008) (citing *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005)).

## A. Robert Debolt

Robert Debolt pleaded guilty to conspiracy, two counts of interstate transportation of stolen vehicles, three counts of interstate transportation of stolen property, and two counts of stealing goods and property from an interstate freight shipment. The district court determined Robert Debolt's Guidelines range to be 78 to 97 months. The statutory maximum for the conspiracy charge was 60 months, 18 U.S.C. § 371, and the statutory maximums for the remaining seven charges were each 120 months. 18 U.S.C. §§ 2312, 2314, 659. The district court sentenced Robert Debolt to 60 months' imprisonment for the conspiracy count and

120 months' imprisonment on each of the remaining seven counts, with the sentences to run concurrently.

*§ 3553(a) Factors*.  We "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.  The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."  *Gall*, 552 U.S. at 51.  Here, the district court focused on the following § 3553(a) factors to justify the twenty-three-month variance:  the nature and seriousness of the offense; the history and characteristics of the defendants; and the need to afford adequate deterrence.  The district court noted that "even though he's got a minor criminal history category, I'm troubled by . . . the allegations of domestic violence."  R. 531, Sentencing Tr. at 212, Page ID 6589.  It also considered the serious nature of the offense and the "substantial financial deprivation" to the seventy-three victims.  *Id.* at 212–13, Page ID 6589–90.  It stressed the fact that Robert Debolt was a truck driver himself and so "kn[e]w what trucks mean to people who drive their own trucks."  *Id.*  And the district court focused on Robert Debolt's role in the conspiracy:

> Yours wasn't in the sense a one way sometime occasional participant.  I have no doubt whatsoever that not only could you reasonably anticipate the damage and loss that you were causing, but that you knew full well and you didn't care.  You continued to do what you did going out, quote, shopping with Mr. Wymer week after week after week after week or every other week, whenever it was.  Nonetheless, you were fully engaged and fully committed to the success of that operation. . . . You played a crucial role in the long-term success of this endeavor.

*Id.* at 213, Page ID 6590.  Additionally, the district court considered the deterrent purpose to the sentence—both for Robert Debolt himself, *id.* at 215, Page ID 6592 (imposing the sentence so that he would "never succumb to this kind of temptation again"), and for the public at large, *id.* ("I hope that . . . this series of sentencings, but particularly yours, is publicized, so if there's

anybody so inclined, whether in this area or elsewhere, to the extent that your sentence comes to their attention, realizes just how harsh and severely at least this Judge and this Court will deal with that kind of crime."). Given the reasoning that the district court gave for why the § 3553(a) factors justified imposing his sentence, it was not an abuse of discretion for the district court to have issued a sentence that exceeded the Guidelines range by 23 months.

*Factors Already Considered by Guidelines*. Robert Debolt argues that his above-Guidelines sentence is substantively unreasonable "because the upward variance was based on factors already considered within the [G]uidelines." R. Debolt Br. 36. He argues that his Guidelines range already encapsulated the amount of loss and the number of victims, and so the district court's concern over the hardships inflicted upon the victims was inappropriate.[8] We have previously rejected the argument that a sentence is substantively unreasonable because the § 3553(a) factors on which the district court relied to sentence the defendant above the advisory Guidelines range were already reflected in the Guidelines calculation. *See United States v. Tristan-Madrigal*, 601 F.3d 629, 636 n.1 (6th Cir. 2010). To hold otherwise "would preclude the district court from being able to comply with § 3553(a)'s mandate and would have the practical effect of making the Guidelines again mandatory, which is plainly not the law." *Id.*[9]

---

[8] Notably, the district court's reasoning did not rest solely on the hardship imposed on the victims, as Robert Debolt claims. As discussed above, the district court based the upward variance on the harm to the victims, but also on Robert Debolt's career as a truck driver and such knowledge of the seriousness of his offense, his role in the conspiracy and in committing the crimes, and the need for deterrence.

[9] Robert Debolt cites to *United States v. Aleo*, 681 F.3d 290, 300 (6th Cir. 2012) for the proposition that "[t]he district court may not justify an upward variance based on factors already envisioned by the Guidelines." R. Debolt Br. 36. *Aleo*, however, does not stand for such a broad proposition. In *Aleo*, we held that because the Guidelines "took into account the very factors that the sentencing judge said that they did not[,] . . . the belief that these factors were not envisioned by the creators of the guidelines is not a compelling justification for the judge's variance from the guidelines range" where the judge sentenced the defendant to almost *two and a half times*

*Tardiness*.  Finally, Robert Debolt argues that the district court gave an above-Guidelines sentence because he had been late returning to the courtroom after a recess.  As discussed above, however, the district court explicitly stated that Robert Debolt's tardiness would "play no role in my sentence.  I would trust my views, and that has nothing to do with the sentence.  We're dealing with the crimes that he committed, and their consequences and the punishment appropriate."  R. 531, Sentencing Tr. at 198, Page ID 6575.

Although the district court sentenced Robert Debolt to an above-Guidelines 120 months' imprisonment, its decision that the § 3553(a) factors, on a whole, justified the extent of the variance was not an abuse of discretion.[10]  Accordingly, we hold that Robert Debolt's sentence is substantively reasonable.

---

*longer* than the top of his Guidelines range.  681 F.3d at 301.  We also noted that such a large variance would result in sentencing disparities, particularly when the defendant's actions were not "the worst possible variation of the crime."  *Id.* at 302.  Thus, we held that the sentence was substantively unreasonable.  *Id.*  *Aleo* does not stand for the proposition that a district court cannot under any circumstances consider § 3553(a) factors already accounted for in the Guidelines calculation to determine what sentence is appropriate.  It is merely an example of the district court's giving an impermissible amount of weight to one of the § 3553(a) factors ("the nature and circumstances of the offense").  *Id.* at 300.

[10] Robert Debolt also argues that "[i]t seems unfair for Debolt to get twice the sentence that his equally culpable co-defendants received simply because he delayed in pleading guilty." R. Debolt Reply Br. 5.  He specifically references Gary Wymer Sr. and John Debolt as examples of those who "were permitted to plead guilty to Count 1" and so "limiting their maximum sentence to 60 months." *Id.*  First, Gary Wymer Sr. and John Debolt did not plead guilty and were convicted by a jury.  Secondly, they were *only charged* in the conspiracy count of the indictment, the statutory maximum for which is 60 months.  18 U.S.C. § 371.  Robert Debolt, however, was charged with conspiracy, *as well as* two counts of interstate transportation of stolen vehicles, three counts of interstate transportation of stolen property, and two counts of stealing goods and property from an interstate freight shipment.  The statutory maximum for each of the non-conspiracy convictions is 120 months.  18 U.S.C. §§ 2312, 2314, 659.  A prosecutor has broad discretion in deciding whom to prosecute and which charges to bring.  *See United States v. Batchelder*, 442 U.S. 114, 123–24 (1979); *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).  And regardless, § 3553(a)(6) "is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct. It is not concerned with disparities between one individual's sentence and another individual's

**B. Terrance Wymer**

Terrance Wymer pleaded guilty to conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. The district court determined his Guidelines range to be 70 to 87 months, but the statutory maximum for conspiracy is 60 months. 18 U.S.C. § 371. Thus, his Guidelines range was 60 months. U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."). The district court sentenced Terrance Wymer to 60 months' imprisonment.

We presume Terrance Wymer's sentence to be reasonable. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc). Terrance Wymer's arguments to the contrary are unpersuasive. First, he argues that his sentence is too severe because it is longer than his father's sentence of 40 months' imprisonment. A district court, however, is under no obligation to equalize sentences between co-defendants. *United States v. Presley*, 547 F.3d 625, 631 (6th Cir. 2008); *Simmons*, 501 F.3d at 623–24. Terrance Wymer also claims to have "virtually no criminal record." T. Wymer Br. 23. This was considered by the district court. *See* R. 528, Presentencing Tr. at 125, Page ID 6024 (discussing Terrance Wymer's previous offenses for driving without a license, driving slow, disorderly conduct, and littering, and then concluding that his criminal history category of III significantly over-represented the seriousness of his criminal history); R. 531, Sentencing Tr. at 114, 132–33, Page ID 6491, 6509–10 (noting that Terrance Wymer was a "criminal history category one, reduced from a three last week").

Terrance Wymer was significantly involved in this criminal enterprise. His primary role was to dismantle the stolen trucks and trailers. He helped to remove any identifying marks so

---

sentence, despite the fact that the two are co-defendants." *United States v. Simmons*, 501 F.3d 620, 623–24 (6th Cir. 2007) (internal citations omitted).

that the stolen items could not be traced. He also scrapped much of the material. He opened the gate at night to facilitate the return of the stolen items. The district court also focused on the need for public deterrence in this case.

Given the above, the district court properly considered the sentencing factors, and it was not an abuse of discretion for the district court to sentence Terrance Wymer to 60 months' imprisonment. Therefore, we hold that his sentence is substantively reasonable.

## V. Conclusion

*Michael Wymer.* Michael Wymer had no reasonable expectation of privacy in the areas that were viewable by passersby on public roads and that were captured by a camera located on the top of a public utility pole. We AFFIRM Michael Wymer's convictions for one count of conspiracy to defraud the government by committing theft of interstate shipments in violation of 18 U.S.C. § 371; four counts of interstate transportation of stolen vehicles in violation of 18 U.S.C. §§ 2, 2312; eight counts of interstate transportation of stolen goods in violation of 18 U.S.C. §§ 2, 2314; and two counts of theft of interstate shipments by carrier in violation of 18 U.S.C. §§ 2, 659.

*Gary Wymer Sr.* There was sufficient evidence to support Gary Wymer Sr.'s conviction for conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371, and so we AFFIRM his conviction. Insurance companies suffer a pecuniary loss when they must payout for stolen items, and so they are victims under U.S.S.G. § 2B1.1(b)(2). Any error that resulted from including eighteen victims under § 2B1.1(b)(2) without including their losses in the loss calculation under § 2B1.1(b)(1) was harmless. Gary Wymer Sr. failed to raise the issue of when he entered the conspiracy, and so the district court was not required to make a specific finding as to that date. The district court did make sufficient findings that all of the criminal

activity was relevant conduct for Gary Wymer Sr. This finding was not clearly erroneous. Thus, the district court's restitution order was not an abuse of discretion. Any error the district court made in imposing a two-level increase for serving in a supervisory role under U.S.S.G. § 3B1.1 was harmless. Thus, Gary Wymer Sr.'s sentence is procedurally reasonable. We AFFIRM his sentence of 60 months' imprisonment, followed by a two-year term of supervised release.

*Robert Debolt.* The district court made sufficient findings that all of the criminal activity during the indictment period was relevant conduct for Robert Debolt. This finding was not clearly erroneous. Thus, the district court's restitution order was not an abuse of discretion. Robert Debolt did not plead guilty until the morning of his trial. An investigator testified to facts inconsistent with Robert Debolt's proffer, and when the probation officer attempted to meet with him a second time to discuss the inconsistencies, he refused to meet. Thus, the district court did not err in denying him a two-level credit for accepting responsibility under § 3E1.1. Although Robert Debolt was sentenced to an above-Guidelines sentence, the district court did not abuse its discretion in believing it was warranted given the seriousness of the offense, his job as a truck driver and greater awareness of the harm caused by the criminal enterprise, and the need for deterrence. Thus, Robert Debolt's sentence was substantively reasonable. We AFFIRM Robert Debolt's sentence of 120 months' imprisonment followed by a three-year term of supervised release.

*Gary Wymer Jr.* The district court made sufficient findings that all of the criminal activity was relevant conduct for Gary Wymer Jr. This finding was not clearly erroneous. We AFFIRM Gary Wymer Jr.'s sentence of 48 months' imprisonment followed by a two-year term of supervised release.

*Terrance Wymer.*  Insurance companies suffer a pecuniary loss when they must pay out for stolen items, and so they are victims under U.S.S.G. § 2B1.1(b)(2).  Any error that resulted from including eighteen victims under § 2B1.1(b)(2) without including their losses in the loss calculation under § 2B1.1(b)(1) was harmless.  The district court did not clearly err in finding that the pre-indictment loss equaled $800,000.  Therefore, Terrance Wymer's sentence is procedurally reasonable.  Terrance Wymer has not overcome the presumption that his in-Guidelines sentence is substantively reasonable.  We AFFIRM Terrance Wymer's sentence of 60 months' imprisonment followed by a two-year term of supervised release.

*John Debolt.*  The district court did not clearly err in finding John Debolt responsible for the total loss of the conspiracy.  Thus, the district court's restitution order was not an abuse of discretion.  We AFFIRM John Debolt's sentence of 60 months' imprisonment followed by a two-year term of supervised release.